# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE

May 24, 2017 Session Heard at Tennessee Technological University[1]

## STATE OF TENNESSEE v. KEVIN E. TRENT

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Claiborne County**
**No. 2014-CR-1918        John McAfee, Judge by Interchange**

---

### No. E2015-00753-SC-R11-CD

---

Kevin E. Trent pled guilty to one count of vehicular homicide by intoxication. He was sentenced by agreement as a Range I standard offender to eight years with the manner of service to be determined by the trial court after a hearing. The trial court subsequently ordered the Defendant to serve his sentence in confinement. On direct appeal, the Court of Criminal Appeals reversed the trial court's ruling and, additionally, affirmatively ordered the Defendant to be placed on full probation. We granted the State's application for permission to appeal to review the Court of Criminal Appeals' decision to reverse the trial court's order that the Defendant serve his sentence in confinement and to affirmatively order that the Defendant be placed on full probation. We agree with the Court of Criminal Appeals that the trial court failed to make sufficient findings for the appellate courts to review the sentence with a presumption of reasonableness. Moreover, our review of the record reveals it is inadequate to conduct an independent review of the sentence imposed by the trial court. As a result, we also hold that the record is not sufficient to support the Court of Criminal Appeals' modification of the Defendant's sentence to order full probation. Accordingly, we reverse the judgment of the Court of Criminal Appeals, vacate the sentencing determination of the trial court, and remand this matter to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Reversed;**
**Remanded to the Trial Court**

---

[1] We heard oral argument in this case at Tennessee Technological University in Cookeville, Tennessee, as part of this Court's **S.C.A.L.E.S.** (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Nicholas W. Spangler, Assistant Attorney General; Lori Phillips-Jones, District Attorney General; and Graham Wilson, Assistant District Attorney General, for the appellant, the State of Tennessee.

Lief Jeffers, District Public Defender; Robert Scott (on appeal and at hearing) and La Tasha Wassom (at hearing), Assistant District Public Defenders, Jacksboro, Tennessee, for the appellee, Kevin E. Trent.

**OPINION**

**Factual and Procedural Background**

While driving his three-quarter-ton pick-up truck on May 3, 2012, Kevin E. Trent ("the Defendant"), struck a vehicle being driven by the victim, Karen Freeman. Ms. Freeman eventually died from the injuries she sustained in the collision. In January 2015, the Defendant pled guilty to one count of vehicular homicide resulting from the fact that he was intoxicated at the time of the collision, a Class B felony. Tenn. Code Ann. § 39-13-213(a)(2), (b)(2) (2010). At the plea hearing, the State and the Defendant stipulated "that Kevin E. Trent, on or about May 3rd, 2012, in Claiborne County, Tennessee, did unlawfully, feloniously and recklessly, as the proximate result of Kevin E. Trent's intoxication, as set forth in 55-10-401, kill Karen Freeman by the operation of a motor vehicle, in violation of 39-13-213." Pursuant to the plea agreement, the Defendant was sentenced as a standard offender to a Range I sentence of eight years with the manner of service to be determined by the trial court after a hearing. At the sentencing hearing, the trial court heard the following evidence.

Judy McGeorge, the victim's mother, testified about the devastating effects of her daughter's death. She explained that, after the May 3, 2012 collision, her daughter remained in the hospital until July 17, 2012, at which time she was transferred to a nursing home. The victim died in the nursing home over a year later, in October 2013. After the collision, the victim was unable to walk or speak. The victim had four children at the time of her death.

Peggy Holt testified that she was the manager at the Springdale Pic N Pay where the Defendant was a regular customer. She recalled that, on the day of the accident, the Defendant "almost hit the canopy pole that is right in front of the store" while he was driving. This occurred sometime between 11:00 a.m. and noon. The parties stipulated that the accident involving Ms. Freeman occurred at approximately 3:00 that afternoon.

Ms. Holt also testified that, on previous occasions when she spoke with the Defendant after he had driven to the store, "he was not very attentive, just kind of stared, slow speech, slurred kind of when [she] spoke with him."

Rick Leonard testified that he was a good friend of the Defendant and had been for six or seven years. Mr. Leonard stated that the Defendant had expressed remorse for having killed the victim. He also stated that he saw the Defendant about three times a week and that he never noticed the Defendant having slurred or slow speech. Mr. Leonard acknowledged that he would not ride in a vehicle that the Defendant was driving because he considered it dangerous due to the Defendant's physical limitations.[2]

Tim Trent, the Defendant's father, described the Defendant as "a real good kid, he's always been a hard worker." He had never known the Defendant to engage in illegal behavior or alcohol or drug abuse. He was very comfortable riding with the Defendant while the Defendant was driving. He reiterated that the Defendant was remorseful about the accident. He explained that the Defendant's reportedly slurred speech could have been caused by the Defendant having "a dip in," stating that, when the Defendant had "a dip in," he "can't hardly understand" the Defendant. Mr. Trent explained that, due to his disabilities, the Defendant needed assistance with his personal hygiene. He also stated that he could accommodate the Defendant if the Defendant were ordered to serve his sentence on house arrest.

On cross-examination, Mr. Trent acknowledged that the accident was caused by the Defendant crossing three lanes of traffic and hitting the victim's vehicle head-on.

In response to questions from the court, Mr. Trent described the modifications that the Defendant had made to his guns in order to keep hunting.

The Defendant testified that he graduated from high school in 2003. Thereafter, he worked a forty-hour a week job and also mowed 42 yards a week. He stated that he drank alcohol only rarely and that he tried marijuana once, which made him violently ill. He never took drugs that he was not prescribed.

In 2005, he had an accident while riding his motorcycle that resulted in the loss of both of his arms below the elbow and his left leg. In spite of these physical limitations, he was able to drive without modifications to his truck. Although he had prosthetic devices, he did not use them while driving. He advised the department of motor vehicles about his physical limitations and was able to renew his driver's license without restrictions. Other than his motorcycle accident and the accident that was the subject of his guilty plea, he had had no other accidents.

---

[2] Due to a motorcycle accident several years earlier, the Defendant had lost both of his arms below the elbows and his left leg.

The Defendant stated that, prior to the accident that was the subject of his plea, he had never been arrested.

After his motorcycle accident, the Defendant was prescribed Oxycodone and Xanax. The Oxycodone was dosed at 30 milligrams and the Xanax was dosed at one milligram. He took these medications as prescribed: the Oxycodone four times a day and the Xanax twice a day. He did not think that his medications impaired his driving.

Asked about the accident that ended the victim's life, the Defendant stated that he had no memory of it or of the three weeks preceding it. Asked about how he felt about the harm that he had caused, the Defendant testified, "I'm—I don't know how to explain it. I feel so bad, I have nightmares about every night. I—I just feel terrible. I just wish I could take it back. I wish it had been me instead of her. I'd give anything."

On cross-examination, the Defendant stated that his doctor had told him that it was okay to drive while taking his medications as prescribed. He could not remember his doctor's name. He denied that his bottle of Oxycodone cautioned him not to drive while taking the medication. The Defendant acknowledged that, on occasion, when his pain was particularly bad, he would take an extra pill after getting home so that he could sleep. He denied taking more medication than prescribed while he was driving. He admitted to having driven "like three times" since the 2012 accident. He also admitted that, since the 2012 accident, he had been prescribed and was taking Oxymorphone, Oxycodone, Zantac, and Zanaflex. He explained that the Oxymorphone was an "extended release" pain reliever and, thus, he was now taking two pain relievers. He stated that the last time he drove was approximately during the spring of 2013 because he did not have a vehicle. He maintained, however, that it was safe for him to drive even while taking his current medications.

On redirect examination, the Defendant acknowledged that he had lost his driver's license after pleading guilty in 2015 and that he could not drive anyone's vehicle for that reason.

The trial court addressed the Defendant and stated, "I'm assuming they drew your blood at the accident. And then that's where they saw these prescription medications were above therapeutic levels. Do you understand that?" The Defendant responded, "Yes." During argument, the Defendant's lawyer stated that the Defendant's "level was point two—it was over the therapeutic range in Oxycodone. He was in therapeutic range on the Xanax." Neither the State nor the Defendant proffered expert testimony or laboratory results at the sentencing hearing.[3]

---

[3] In his brief to the Court of Criminal Appeals, the Defendant asserted that "[t]he toxicology report analysis of [his] blood obtained at the time of the accident indicated a level of oxycodone in the toxic range (0.22 ug/ml) and alprazolam in the therapeutic range (63.5 ng/ml)." However, the evidence

4

The court also asked the Defendant whether there were any warnings on the labels of his Oxycodone and Xanax bottles. The Defendant replied, "It said it may cause drowsiness." The court then asked, "Does it tell you not to drive?" The Defendant responded, "No. I talked to my doctor about it."

The presentence report, which was admitted into evidence without objection, indicates that, in his general sessions arrest affidavit completed after the accident, Tennessee Highway Patrol Trooper Bobby Brooks described the accident as occurring after the Defendant "crossed the center line on US Hwy 25E, striking the vehicle being driven by Karen Freeman . . . ." The presentence report also indicates that the Defendant explained to the investigator who was preparing the report that the Zanaflex medication he was currently taking was a muscle relaxant.

After considering the proof before it, the trial court ruled as follows:

> All right. Well, let me just go through and summarize just a little bit.
>
> Of course, Ms. Freeman passed away, and her mother testified here today, a very sweet lady, and got a—got a pretty good picture and image of Ms. Freeman, and I looked at the pictures and the photographs. She's a very beautiful lady, four children, just appeared to be full of life.
>
> We do know that at the time of the accident, she was severely injured, was at UT approximately six weeks, she was in the nursing home for a year and a half thereafter and passed away on October 9, 2013, severe brain injuries, she couldn't talk, she couldn't walk, she couldn't feed herself, she couldn't breathe on her own, obviously very severe injuries and—and undoubtedly suffered at the last part—last few days of her life— the last few months or weeks.
>
> Peggy Holt testified. She said that she—and I think that if I remember this correctly, six, seven times that she knew of the defendant on those occasions, he appeared to have slurred speech because she'd have to go out to the vehicle and to get money because of his handicap. On the day of the accident a little—at lunch or a little after lunch, she said she witnessed him there at the gas station and he nearly struck the canopy pole that was there. The accident occurred, we know, and it was agreed to when I asked the trooper a moment ago about 3:05 that afternoon.

---

supporting this statement does not appear in the record. Apparently, the toxicology report was never introduced at the sentencing hearing.

Mr. Leonard testified which is a friend of the defendant here in this case. They had been friends about six or seven years, and—but the one note that I would say, he said he was a really good person, a kind person, and again, I'm summarizing and—but he did say—and I made a note to the fact that he wouldn't ride with him because it appeared to be a dangerous situation, and he was very candid about his handicap as the reason why he didn't do that.

Mr. Trent, the defendant's father, testified. Seemed to be a very genuine man and should—should be given credit, he stuck with his son for all these years after the motorcycle accident where he lost his limbs, made modifications to his limbs [sic] so he could hunt. Apparently, hunting is an important part of their life, and made modifications. And I think the district attorney has noted that there were never any modifications made to the vehicle as far as his ability to drive, but they appear to be very extensive modifications to hunt, even to dove hunt. I understand with other types of hunting but with dove hunting, you have to be moving with a shotgun and so, they made accommodations. It appeared even from the—even from his dad's testimony that his son was a very independent person, he said, and continued to mow, not as much, I think, prior—and after the motorcycle accident, and we do know that he was driving and owned a three-quarter ton Chevy pickup truck, four doors. And I was somewhat—I think he was living back and forth—the defendant was living back and forth—Cocke County and Claiborne County. He was living in Claiborne County at some—at some times, and the accident, of course, occurred here in this county.

Defendant testified, says he can't remember a whole lot that happened after the accident. He did admit that he has taken excessive—greater amounts of his medication that's above what his prescription is for. He seemed—he can't—he seemed to not be able to remember his physician which is a pain clinic which is in Bulls Gap, and he says he attends a—which has nothing to do with this maybe today, but Skyview in Knoxville which is another pain clinic. *Said he continued to drive three times at least after this accident.* And I think he made it very clear that—I think even through his testimony, it's obvious that he seems to think he's a very independent person, he didn't need accommodations for anything. He indicated that he's in severe pain and has to take these medications to function at times, but he continued to drive.

6

I believe enhancement factor ten[4] applies in this case based upon the two cases that were submitted to the Court.[5] Because of that pain medication, because of what he was doing—and sometimes that can be somewhat dangerous, especially with people who have been independent. It appears that the defendant worked quite a bit, was a hard worker prior to his motorcycle accident and wanted to continue to do so. I think his dad indicated that. His dad said he wanted to try to live his life. And sometimes that's a dangerous situation and especially if you're taking medications and you want to drive and you want to continue to operate a vehicle. *I found it somewhat disconcerning (sic) that the defendant knew very little about any kind of limitations on his medicine.* He sort of indicated or testified that—that he could operate a vehicle as long as—I guess as long as he was—with taking his medicine as prescribed, but he also told me that he took excess amounts of those prescribed medications. He says he remembers the label saying it may cause drowsiness.

*This obviously is very serious, and I—and I asked about a stipulation of fact a moment ago. Of course, we read in the indictment, and <u>I don't know how the accident occurred other than the fact of what's in the indictment and what he agreed to in the stipulation.</u>[6] This is a serious situation. The defendant should be commended for not having a prior criminal history and dealing with the motorcycle accident. I concur with his attorney there, he showed a lot of resilience after the—after the motorcycle accident. But, <u>this situation in and of itself, he should not have been operating that vehicle that day. He pled guilty to that.</u> If he had not been in that vehicle that day, Ms. Freeman would still be alive. He made a decision to take excess amount of his pain killers and operate a vehicle that day and killed another human being. He made that decision—an unfortunate decision, but he made that decision. <u>That being the case,</u> the Court is going to remand the defendant to Tennessee Department of Correction[] for eight years.*

(Emphases and footnotes added).

---

[4] "The defendant had no hesitation about committing a crime when the risk to human life was high[.]" Tenn. Code Ann. § 40-35-114(10) (2010).

[5] The prosecutor argued for the application of <u>State v. Williamson</u>, 919 S.W.2d 69 (Tenn. Crim. App. 1995), and <u>State v. Lambert</u>, 741 S.W.2d 127 (Tenn. Crim. App. 1987).

[6] It appears that the trial court was referring to the stipulation entered into the record at the guilty plea hearing, recited above.

The Defendant appealed to the Court of Criminal Appeals, arguing that the proof did not support the trial court's decision to deny probation solely to avoid depreciating the seriousness of the offense because the circumstances of his offense were not "'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.'" State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) (quoting State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995)). The Court of Criminal Appeals agreed. Accordingly, the intermediate appellate court reversed the trial court's ruling and imposed a sentence of probation. State v. Trent, No. E2015-00753-CCA-R3-CD, 2016 WL 3996467, at *8 (Tenn. Crim. App. July 21, 2016). We granted the State's application for permission to appeal.

## Standard of Review

In State v. Bise, this Court adopted an abuse of discretion standard of review for sentences imposed pursuant to the Tennessee Criminal Sentencing Reform Act of 1989, as amended in 2005, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." 380 S.W.3d 682, 707 (Tenn. 2012). We further held in Bise that

> a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id. at 706. We also noted, however, that "appellate courts cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence." Id. at 705 n.41.

In State v. Caudle, this Court determined that this same standard of review should be applied to a trial court's decision regarding alternative sentencing: "[W]e now explicitly hold that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278–79 (Tenn. 2012).

## Analysis

The issue before this Court is whether the Court of Criminal Appeals erred in reversing the trial court's decision to sentence the Defendant to incarceration and

8

imposing, instead, the alternative sentence of probation.[7]  In addressing this issue, it is helpful to set forth the controlling provisions of our Sentencing Act:

The foremost purpose of [the Sentencing Act] is to promote justice, as manifested by [Tennessee Code Annotated section] 40-35-103.  In so doing, the following principles are adopted:

(1) Every defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense;

(2) [The Sentencing Act] is to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions;

(3) Punishment shall be imposed to prevent crime and promote respect for the law by:

(A) Providing an effective general deterrent to those likely to violate the criminal laws of this state;

(B) Restraining defendants with a lengthy history of criminal conduct;

(C) Encouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants; and

(D) Encouraging restitution to victims where appropriate;

(4) Sentencing should exclude all considerations respecting race, gender, creed, religion, national origin and social status of the individual;

(5) In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration; and

---

[7] Although the parties in this case have focused on probation, our Sentencing Act provides for a wide range of alternative sentences, including periodic confinement, split confinement, work release, and community corrections.  See Tenn. Code Ann. § 40-35-104(c) (2010).  The availability of an alternative sentence depends upon the conviction offenses and the defendant's prior convictions, if any.

9

(6)(A) A defendant who does not fall within the parameters of subdivision (5), and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary; however, a defendant's prior convictions shall be considered evidence to the contrary and, therefore, a defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing;

(B) As used in subdivision (6)(A), "separate periods of incarceration or supervision" means that the defendant serves and is released or discharged from a period of incarceration or supervision for the commission of a felony prior to committing another felony;

(C) If a defendant with at least three (3) felony convictions is otherwise eligible, that defendant may still be considered a favorable candidate for any alternative sentencing that is within the jurisdiction of and deemed appropriate by a drug court;

(D) A court shall consider, but is not bound by, the advisory sentencing guideline in this subdivision (6).

Tenn. Code Ann. § 40-35-102 (2010).

Tennessee Code Annotated section 40-35-103, referred to in the first sentence of the foregoing, provides as follows:

To implement the purposes of [the Sentencing Act], the following principles apply:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

10

(2) The sentence imposed should be no greater than that deserved for the offense committed;

(3) Inequalities in sentences that are unrelated to a purpose of [the Sentencing Act] should be avoided;

(4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed;

(5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence; and

(6) Trial judges are encouraged to use alternatives to incarceration that include requirements of reparation, victim compensation, community service or all of these.

Tenn. Code Ann. § 40-35-103 (2010).

Additionally, and particularly significant in this case, Tennessee Code Annotated section 40-35-303 provides as follows:

(a) A defendant shall be eligible for probation under [the Sentencing Act] if the sentence actually imposed upon the defendant is ten (10) years or less; . . . .

(b) A court shall have authority to impose probation as part of its sentencing determination at the conclusion of the sentencing hearing. There shall be no petition for probation filed by the defendant and probation shall be automatically considered by the court as a sentencing alternative for eligible defendants; provided, that nothing in [the Sentencing Act] shall be construed as altering any provision of present statutory or case law requiring that *the burden of establishing suitability for probation rests with the defendant*.

Tenn. Code Ann. § 40-35-303 (a), (b) (2010) (emphasis added). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997) (internal quotation marks omitted). We agree with our Court of Criminal Appeals that "[t]he guidelines applicable in determining whether to impose probation are the same factors

11

applicable in determining whether to impose judicial diversion." State v. Scott, No. M2010-01632-CCA-R3-CD, 2011 WL 5043318, at *11 (Tenn. Crim. App. Oct. 24, 2011) (citing Bingham, 910 S.W.2d at 456). Those factors include (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value. See State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

Before imposing a sentence, the trial court is statutorily required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). This provision of the Sentencing Act also requires the trial court to "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, *as well as the reasons for the sentence*, in order to ensure fair and consistent sentencing." Id. § 40-35-210(e) (emphasis added).

These are only a few of the many statutory provisions applicable to the imposition of a sentence following a defendant's conviction of a criminal offense. See generally Tenn. Code Ann. §§ 40-35-101 through 40-35-505 (2010, Supp. 2012). There is no question that the construction and application of these statutes is complicated and often confusing. Nevertheless, the imposition of a sentence on a criminal defendant is one of the most important decisions that trial courts are called upon to make because they invariably reduce a person's liberty, often eliminating it entirely. Accordingly, it is

imperative that trial judges approach the process only after thoroughly familiarizing themselves with the applicable provisions of our Sentencing Act. Moreover, although we emphasize that there are no "magic words" that trial judges must pronounce on the record, it is also critical that, in their process of imposing sentence, trial judges articulate fully and coherently the various aspects of their decision as required by our statutes and case law. As we recently reiterated, "our ruling in Bise specifically requires trial courts to articulate the reasons for the sentence in accordance with the purposes and principles of sentencing in order for the abuse of discretion standard with a presumption of reasonableness to apply on appeal." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013) (citing Bise, 380 S.W.3d at 698-99).

In this case, the Court of Criminal Appeals reversed the trial court and ordered probation after concluding that the trial court's sole reason for denying probation was in order to avoid depreciating the seriousness of the Defendant's crime and that the record did not support that ruling. Trent, 2016 WL 3996467, at *8. When the seriousness of a defendant's crime is the sole reason for ordering incarceration, the circumstances of the particular crime committed by the defendant must be evaluated. This Court has long held that

> if probation is to be denied because of the nature of the offense, it would have to be clear that the criminal act, *as committed*, would be described as especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree; and it would have to be clear that, therefore, the nature of the offense, *as committed*, outweighed all other factors . . . which might be favorable to a grant of probation.

State v. Travis, 622 S.W.2d 529, 534 (Tenn. 1981) (emphases added).

Although Travis predates the Sentencing Act by several years, this Court has continued to recognize its vitality, most recently in State v. Sihapanya, 516 S.W.3d 473, 476 (Tenn. 2014) (per curiam) (citing State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006)). The Travis factors make sense within the matrix set forth in the Sentencing Act because the Act renders eligible for probation certain defendants committing certain crimes. That is, our legislature has specified that a sentence of probation *is* to be considered for certain defendants who commit certain crimes *regardless of the basic elements of those crimes*. If trial courts were permitted to deny probation solely on the basis of the elements of probation-eligible offenses, then the statute providing for probation-eligibility for those offenses would be rendered a nullity. Our obligation to construe statutes in a manner to avoid nullification of any other statutes prohibits this outcome. See Tidwell v. Collins, 522 S.W.2d 674, 676 (Tenn. 1975); Braswell v. AC & S, Inc., 105 S.W.3d 587, 590 (Tenn. Ct. App. 2002); City of Caryville v. Campbell Cnty., 660 S.W.2d 510, 512 (Tenn. Ct. App. 1983).

Accordingly, before a trial court can deny probation solely on the basis of the offense itself, the circumstances of the offense *as particularly committed in the case under consideration* must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense. Ergo, that a defendant killed someone while driving intoxicated is not sufficient, in and of itself, to deny probation because our legislature has determined that this crime is probation-eligible. Thus, as correctly noted by the Court of Criminal Appeals below, "a trial court may not consider factors that constitute elements of the offense in determining whether the circumstances of an offense" are sufficient to deny an alternative sentence. Trent, 2016 WL 3996467, at \*4 (citing Housewright, 982 S.W.2d at 358). Therefore, the Defendant in this case, because he is a standard offender convicted of a Class B felony, is entitled to be considered for probation in spite of the fact that he committed vehicular homicide by intoxication.

In this case, the trial court made no findings regarding the particular circumstances surrounding the Defendant's commission of vehicular homicide by intoxication. Indeed, the trial judge stated, "I don't know how the accident occurred other than the fact of what's in the indictment and what he agreed to in the stipulation." Neither the indictment nor the stipulation recited anything other than the basic elements of the offense of vehicular homicide resulting from intoxication. At the sentencing hearing, there was no expert proof about the Defendant's medications or their effects; no toxicology report indicating the extent of the Defendant's overdose or how many extra pills he would had to have taken in order to reach that blood level; no proof about the Defendant's speed at the time of the accident; no proof about how the Defendant came to be driving in the victim's lane of traffic; and no proof that the Defendant had been warned not to drive by any of his medical or pharmaceutical providers prior to the accident. Accordingly, the trial court lacked sufficient proof upon which to deny probation solely on the basis of the seriousness of the crime *as committed*. Rather, it appears to us that the trial court may have denied probation based simply upon the elements of the offense. If so, the trial court abused its discretion.

Nevertheless, we disagree with both the Court of Criminal Appeals and the parties that the record demonstrates conclusively that the seriousness of the Defendant's offense was the *only* basis for denying probation that the trial judge considered. Our close analysis of the trial court's ruling indicates that the judge also may have been concerned with the fact that the Defendant had driven several times after having committed vehicular homicide. Moreover, the record indicates that, after the instant offense, the Defendant's medications were altered to an even stronger combination, rendering any subsequent driving particularly worrisome. The trial court also expressed concern that the Defendant "knew very little about any kind of limitations on his medicine." Thus, it appears to us that the trial court may have been considering the Defendant's likelihood of reoffending, a "fundamental consideration in determining whether to grant or deny probation." State v. Evans, No. E2000-00069-CCA-R3-CD, 2001 WL 274069, at \*4

14

(Tenn. Crim. App. Mar. 20, 2001); see also, e.g., State v. Jones, No. M2013-02720-CCA-R3-CD, 2014 WL 4953612, at *2 (Tenn. Crim. App. Oct. 3, 2014), perm. app. denied (Tenn. Dec. 17, 2014); State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999) (citing Tenn. Code Ann. 40-35-103(5)). Unfortunately, the trial court failed to explain on the record any determinations it made regarding the Defendant's amenability to correction. Nor did the trial court explain why, apparently, it concluded that the Defendant had failed to carry his burden of establishing his suitability for probation.

Although not a basis in and of itself for vacating a sentence, we also note that the trial court misapplied the single enhancement factor to which it made specific reference: that the Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). During argument at the sentencing hearing, the prosecuting attorney contended that this enhancement factor applied based on the Defendant's

> use of the vehicle, knowing that he was on these types of medications, knowing that the vehicle had no accommodating [sic], knowing that he wasn't wearing any prosthetic, and that he knew that the risk to human life was high, and he had no hesitation about committing this offense. And even when his own witness, Mr. Leonard, testified, he testified he wouldn't ride with him because he was scared to ride with him because of the danger involved.

However, the law has been clear for over twenty years that this enhancement factor is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim. See Bingham, 910 S.W.2d at 452, 453 (holding that "enhancement factor (10) may be applied where the defendant creates a high risk to the life of a person other than the victim" and that the applicability of this enhancement factor depends upon "whether there is proof in the record that the [defendant] created a high risk to the life of a person other than the victim"), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000); see also, e.g., State v. Reid, 91 S.W.3d 247, appx. 312 (Tenn. 2002) (noting that enhancement factor (10) "may be applied where the defendant creates a high risk to the life of a person other than the named victim"); State v. Dowdy, No. M2011-00939-CCA-R3-CD, 2012 WL 1808866, at *7-8 (Tenn. Crim. App. May 17, 2012) (where defendant pled guilty to vehicular homicide by recklessness, holding that trial court erred in applying enhancement factor (10) because "the proof in the record does not establish that there was a risk to someone other than the victim in this case"), perm. app. denied (Tenn. Aug. 16, 2012); State v. Maines, No. E2003-02397-CCA-R3-CD, 2004 WL 833424, at *3 (Tenn. Crim. App. Apr. 16, 2004) (holding that trial court erred in applying enhancement factor (10) because "there was no evidence that other motorists were in the vicinity or placed at risk by the [defendant's] operation of a vehicle while under the influence"); State v. Dean, 76 S.W.3d 352, 381 (Tenn. Crim. App. 2001) (holding that

enhancement factor (10) was not applicable because only the victim was put at risk during the offense); State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000) ("[T]he trial court may consider this factor when the defendant endangers the lives of people other than the victim.") (citing State v. Ruane, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995); State v. Johnson, 909 S.W.2d 461, 464 n.1 (Tenn. Crim. App. 1995); State v. Butler, 900 S.W.2d 305, 314 (Tenn. Crim. App. 1994)); State v. Rhodes, 917 S.W.2d 708, 714 (Tenn. Crim. App. 1995) (holding that enhancement factor (10) does not apply to vehicular assault where the record fails to indicate that any person other than the victim was actually threatened by the defendant's driving because "vehicular assault reflects the legislature's appreciation of the substantial risk of and actual degree of harm that results from DUI caused injury"). The record in this case contains no proof that any person other than the victim was put at risk by the Defendant's offense.[8] Accordingly, the trial court erred in this regard.

We also note that the trial judge did not express his conclusions about the Defendant's credibility. Nor did the trial court set forth any findings or conclusions based upon the presentence report, which was admitted without objection, although the record reflects that the trial court took time to review the presentence report. We note specifically that the presentence report states that the Defendant "is considered low risk in terms of the likelihood of him re-offending." Because the trial court did not expressly set forth its findings as to the Defendant's amenability to correction, and because, as set forth above, there is some indication that the trial court was concerned about this factor, the trial court's failure to refer to this aspect of the presentence report is troubling.

Additionally, the presentence report indicates that, in his general sessions arrest affidavit completed after the accident, Tennessee Highway Patrol Trooper Bobby Brooks described the accident as occurring after the Defendant "crossed the center line on US Hwy 25E." This description of the accident is possibly in conflict with the prosecuting attorney's assertion during his cross-examination of the Defendant's father that the Defendant struck the victim's vehicle after crossing three lanes of traffic. Although the Defendant's father agreed with the prosecuting attorney's assertion, there is no proof in the record that the Defendant's father witnessed the accident. Thus, the actual circumstances of the offense are not clear from the record.

In sum, it appears to us that the trial court did not undertake the proper analysis before imposing a sentence in this case. Therefore, the trial court did not adequately comply with the many and various prerequisites that must be satisfied before imposing a

---

[8] Although there was proof that the Defendant almost hit a canopy pole at the Springdale Pic N Pay at least three hours prior to the accident, this is not sufficient proof to support the application of enhancement factor (10), which looks to the circumstances of the offense for which a defendant is being sentenced. Moreover, any risk to the Defendant's own life by his driving does not support the application of enhancement factor (10). See State v. Flatt, No. M2008-01959-CCA-R3-CD, 2009 WL 4438285, at *11 (Tenn. Crim. App. Dec. 2, 2009).

sentence. Thus, in spite of our gleaning a possible additional basis relied upon by the trial court for denying probation (the Defendant's amenability to correction due to his driving after the accident and the Defendant's failure to inform himself adequately about the effects of the medications he was taking), the record before us simply does not permit the presumption of reasonableness to attach to the sentencing decision made by the trial court. Most significantly, the trial court failed to articulate its reasons for ordering incarceration in accordance with the purposes and principles of sentencing. In particular, because the trial court was not more explicit in its reasoning, we are concerned that it may have ordered incarceration based simply upon the elements of the crime in spite of our legislature having provided that persons who commit vehicular homicide by intoxication are eligible for probation.

Nevertheless, we also conclude that the Court of Criminal Appeals erred in ordering that the Defendant be placed on full probation. The record in this case simply is not sufficient to support that court's modification of the trial court's sentence. While we recognize that an appellate court may undertake an independent review of the record in cases in which the trial court fails to make sufficient findings in a case, the record must be sufficient to allow meaningful appellate review. Moreover, this action by the Court of Criminal Appeals appears to ignore the fact that the burden of proving suitability for full probation is on the Defendant, not the State. See Tenn. Code Ann. § 40-35-303(b); Carter, 254 S.W.3d at 347. Therefore, in this case in which the record is not capable of meaningful appellate review, it was not appropriate for the Court of Criminal Appeals to affirmatively order that the Defendant be placed on probation. Rather, we hold that the proper remedy in this case is a remand to the trial court for a new sentencing hearing.

## Conclusion

We reverse the judgment of the Court of Criminal Appeals. We also vacate the sentencing determination of the trial court. Finally, this matter is remanded to the trial court for a new sentencing hearing.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

17