IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2024

**STATE OF TENNESSEE v. JEFFREY L. BROUSSEAU**

**Appeal from the Criminal Court for Sullivan County**
**No. S76570    James F. Goodwin, Jr., Judge**

_____

**No. E2023-01432-CCA-R3-CD**

_____

The Defendant, Jeffrey L. Brousseau, appeals from his guilty-pleaded convictions for possession with the intent to deliver or sell one-half gram or more of methamphetamine; possession with the intent to deliver or sell marijuana; theft of property valued at $1,000 or less; driving while in possession of five grams of methamphetamine; and driving on a suspended license.  Pursuant to the terms of the plea agreement, the Defendant received an effective ten-year sentence, and the trial court was to determine the manner of service.  The trial court subsequently denied the Defendant's request for alternative sentencing, a decision the Defendant now appeals.   Following our review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

William W. Gill, Assistant Public Defender – Appellate Division, Tennessee District Public Defenders Conference; Andrew Gibbons, District Public Defender; and Andrew Vodden, Assistant District Public Defender, for the appellant, Jeffrey L. Brousseau.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Barry P. Staubus, District Attorney General; and David Bledsoe and Alex Griffith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.        FACTUAL AND PROCEDURAL HISTORY**

We glean the following facts supporting these offenses from the sworn affidavit of Officer Travis Bates of the Kingsport Police Department ("KPD"). In the affidavit, Officer Bates provided that he was patrolling in the area of the Westside Inn on November 25, 2021, when he saw a white vehicle parked near the front office of the inn. Officer Bates noticed that the vehicle was occupied. After giving dispatch the tag number, he was informed that the vehicle had been reported stolen. Officer Bates approached the vehicle. The Defendant was in the driver's seat, and a female occupant, Kaitlyn Guy, was in the passenger's seat.

After approaching the vehicle, Officer Bates detected the smell of marijuana coming from inside. He walked his trained dog around the vehicle. The canine alerted on the vehicle, but Officer Bates did not find any illegal substances in the vehicle upon a search. After patting down the Defendant, Officer Bates located in the Defendant's front right pants pocket "a small baggie" containing a white powdery substance. In the Defendant's front left pants pocket was a large zip-lock bag labeled "PK ½ oz." In that large bag was a green, leafy substance with two smaller bags inside the larger bag, each containing the same leafy substance. Also, in the Defendant's front left pants pocket, Officer Bates found another large zip-lock bag with eleven small bags inside that contained a white, crystalline substance. According to Officer Bates, the white powdery substance weighed 4.0 grams in total; the green, leafy substance weighed 20.8 grams in total; and the white, crystalline substance weighed 30.8 grams in total.

The Defendant was arrested and transported to jail. The record reflects that on November 27, 2021, the Defendant was released on a $15,000 bond.

Based on these events, in January 2023, a Sullivan County grand jury indicted the Defendant for the following charges: possession with the intent to deliver or sell twenty-six grams or more of methamphetamine (count 1); possession with the intent to deliver or sell marijuana (count 2); theft of property valued at $1,000 or less (count 3); driving while in possession of five grams of methamphetamine (count 4); and driving on a suspended license (count 5). Tenn. Code Ann. §§ 39-14-103, -17-417, -434; 55-50-504, -506.

On May 11, 2023, the Defendant pleaded guilty in count 1 to possession with the intent to deliver or sell one-half gram or more of methamphetamine, a Class B felony. He also pleaded guilty to remaining offenses as charged. He stipulated to the facts in Officer Bates's affidavit. The Defendant agreed that he would be sentenced to ten years as a Range I, standard offender at thirty percent on count 1, with the sentences for the other offenses

to run concurrently. The parties agreed that the trial court would determine the manner of service following a sentencing hearing.

A sentencing hearing ensued on September 22, 2023. The presentence report provided the thirty-three-year-old Defendant's criminal history, listing seventeen previous convictions that ranged in date from 2007 to 2022. His criminal history included convictions for accessory after the fact of a robbery, domestic violence, drug possession, possession of drug paraphernalia, multiple thefts, joyriding, and various traffic offenses. Also, the report indicated that the Defendant had been awarded probationary sentences several times for various convictions. While on bond in this case, the Defendant was convicted separately of driving without a license and driving on a suspended license. Additionally, the report listed parole revocations from South Carolina in 2012 and 2014.

The Defendant, testifying at the hearing, stated that he went to the Westside Inn on November 25, 2021, in an inebriated state, to have Thanksgiving dinner with a friend. The Defendant said that he had pockets full of drugs because he did not want to leave them at home. The Defendant conceded admitting to the police to possessing marijuana and methamphetamine that day. The Defendant paid $500 for the approximately twenty-eight grams of methamphetamine found on his person. The Defendant said that he placed the methamphetamine in individual bags himself and that, despite pleading guilty to possession with the intent to sell, the methamphetamine was for his personal use.

The Defendant testified further that he had used methamphetamine since September or October 2021, though he stated he had been using marijuana since the age of thirteen and had occasionally used cocaine around that time. He used methamphetamine "[a]s many times a day as [he] could . . . without giving off that [he] was high." He further testified that he had suffered many family deaths in a short amount of time. The Defendant said that he developed his addiction to methamphetamine as a result of these family deaths, his son's abuse by the Defendant's ex-wife's partner, and depression. The Defendant stated that his ex-wife's partner fractured the Defendant's son's skull and that the Defendant obtained emergency custody of his son during that time. The Defendant additionally testified that his son, who was nine years old at the time of the sentencing hearing, was diagnosed with autism and that the Defendant was his primary caregiver.

After the Defendant's arrest in 2021 for these offenses, he enrolled himself in an outpatient rehabilitation program where he received counseling and therapy. As a part of that program, the Defendant was prescribed Subutex to assist him in overcoming his substance abuse problems. He testified that he had passed eighteen consecutive drug screenings, each indicating only the presence of Subutex.

The Defendant acknowledged that he had a felony conviction as an eighteen-year-old for letting someone use his vehicle to commit a robbery. As a result, he was charged with armed robbery, which was later reduced to accessory after the fact of the robbery. The Defendant indicated that his two previous parole revocations were the result of his homelessness, which led to his failure to comply with the conditions of release. He explained, "[T]o do parole, you had to have an address in the state, and at that point and time all of my family was out of state. So, when they released me, I had nowhere to go, and I absconded because I had nowhere to go[.]" When asked about his criminal convictions since that time, the Defendant said, "I've had my love affair with substance abuse, I'm not the person I was, all of those charges are 18, 19, 20, 21 years old, and I just don't stand for the same things that I used to."

On cross-examination, the Defendant admitted that his only sources of income were social security and food assistance. He did not receive payment for being his son's primary caregiver. He also stated that Ms. Guy, his girlfriend who posted his bond, was a dog groomer. When the Defendant was asked from whom he had bought the drugs, he responded, "The [W]estside [Inn], it was whoever was selling that day at the [W]estside."

After the Defendant's testimony, Bunny Hutchins, Ms. Guy's mother, testified. Ms. Hutchins had known the Defendant for ten years, and she testified to recently noticing changes in the Defendant's behavior. He had striven to be a better person and had become caring and helpful. Ms. Hutchins stated he helped her with her mother who was battling cancer, and Ms. Hutchins' grandchildren referred to the Defendant as their father, though he was unrelated to some of them.

Finally, the State called Officer Bates to testify about the events of November 25, 2021. He explained what he typically looks for in determining whether a suspect possesses drugs for personal use or for the purpose of sale or delivery. Specifically, Officer Bates stated as follows:

> The packaging that it's in, if it's in multiple baggies, in this case it was in multiple baggies that were similar weights and different weights. There were three 1-gram bags of methamphetamine, and then 4 bags of 2 grams, and then 4 bags of 4 grams, so they were all similar weights like they were ready to be distributed quickly. Also, if there's money, scales, and also, we didn't locate any paraphernalia, which is more of a sign of someone using.

- 4 -

Officer Bates opined that in his training and experience, over twenty-six grams of methamphetamine was not for personal use. On cross-examination, Officer Bates stated he had never heard of the Defendant or that the Defendant was involved in any drug operations before the events of November 25, 2021.

At the conclusion of the State's and the Defendant's proof at the sentencing hearing, the trial court stated on the record its considerations in making its sentencing decision. The trial court stated that the Defendant's criminal history was "an important negative factor" to its decision. The trial court recounted the Defedant's various criminal convictions that began when the Defendant was just a teenager. The trial court noted that the Defendant had recent convictions, despite the Defendant's attempt to downplay his criminal history as occurring a long time ago. The trial court also noted the fact that the Defendant had been on supervised probation multiple times and that his parole had twice been violated.

Then, the trial court addressed the Defendant's history of substance abuse and his "love affair" with methamphetamine. Relative to the Defendant's use of Subutex in his rehabilitation program, the trial court stated,

> From my work in Recovery Court, my recollection is that Subutex is a substitute for [o]piates to help people get off of [o]piates, it is not from my recollection, it is not a drug that should be prescribed to try to get someone off of [m]ethamphetamine, and clearly [m]ethamphetamine, pursuant to his testimony, is his drug of choice, that and [m]arijuana. So, the [c]ourt questions the validity of this program that he seems to be in, and to me that's a negative factor.

However, the trial court also stated that while it "question[ed] the methodology of [the Defendant's] provider, . . . that's not necessarily his issue."

Relative to the Defendant's truthfulness at the hearing, the trial court noted, "Several other things concern the [c]ourt though about the testimony that I heard today." Specifically, the trial court said,

> [W]hen asked where he got his [m]ethamphetamine, he just said . . . ["W]estside [Inn"]. He did not volunteer his source of supply which gives the [c]ourt pause. Because what that typically indicates is he's not finished with selling [m]ethamphetamine or using [m]ethamphetamine either one.

The trial court observed that Officer Bates did not find any paraphernalia in the Defendant's vehicle and that there were eleven individually packed bags of methamphetamine found on the Defendant's person. The trial court found it "a little bit disingenuous" that the Defendant said "that [he] bought $500.00 worth of [m]ethamphetamine in small individual amounts, individually packaged, for [his] own personal use[.]" The trial court described the Defendant as "more of a drug dealer than . . . an addict." The trial court surmised, "So, I think those are all negative factors. Had he testified that yes, I was selling [m]ethamphetamine in order to sustain my own use, that would be a whole different ballgame."

The trial court also noted that according to the risk and needs assessment in the presentence report, the Defendant had a high risk of violence and moderate needs for education, employment, and drug use.

Finally, the trial court referred to several positive factors in the Defendant's favor. The trial court gave "[the Defendant] positive credit for taking care of his children." The trial court also listed the Defendant's seeking drug treatment as a positive factor.

Ultimately, the trial court determined that "the negative factors far outweigh[ed] any positive factors" and ordered the Defendant to serve his ten-year sentence in prison. This timely appeal followed.

## II.    ANALYSIS

On appeal, the Defendant argues that the trial court erred in ordering him to serve his ten-year sentence in confinement. Specifically, the Defendant argues that the trial court erred in considering as negative factors the Defendant's drug treatment methodology and the Defendant's failure to volunteer the name of his drug supplier. The State contends that the record supports the trial court's exercise of discretion in ordering the Defendant's confinement. For the following reasons, we agree with the State.

When an accused challenges the length of a sentence or manner of service, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the *Bise* standard to "questions related to probation or any other alternative sentence"). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). This court will uphold the trial court's

sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

Tennessee Code Annotated section 40-35-102(5) states that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." A trial court should consider the following when determining a defendant's suitability for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). The advisory sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, *should be* considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann. § 40-35-102(6)(A) (emphasis added). However, no longer is any defendant entitled to a presumption of being a favorable candidate for alternative sentencing. *Carter*, 254 S.W.3d at 347.

Relative specifically to probation, a defendant who receives a sentence of ten years or less, except for certain specified offenses, is eligible for probation. Tenn. Code Ann. § 40-35-303(a). While the trial court is required to automatically consider probation as a sentencing option, *see* Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, *see State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). "[T]he burden of establishing suitability for probation rests with the defendant[,]" including the defendant's showing that probation will serve the ends of justice and the best interests of the public and the defendant. *Carter*, 254 S.W.3d at 347 (quoting Tenn. Code Ann. § 40-35-303(b), *State v. Housewright*, 982 S.W.2d 354, 357

(Tenn. Crim. App. 1997)). Additionally, among the factors applicable to probation consideration are: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). In assessing a defendant's potential for rehabilitation, candor is a relevant factor, and "the lack of candor militates against the grant of probation." *State v. Souder*, 105 S.W.3d 602, 608 (Tenn. Crim. App. 2002); *see State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983).

The Defendant first asserts that the trial court committed reversible error in finding that the methodology of the Defendant's treatment—his use of Subutex—was a negative factor that weighed against his potential for rehabilitation. The Defendant contends that the trial court impermissibly relied on its "personal knowledge rather than properly admitted evidence." In general, a trial court may not consider evidence other than those presented in court. *See* Tenn. Code Ann. § 40-35-210(f). A trial court should not "'assume facts not in the record, base a sentence on extraneous facts, or take judicial notice of facts not available to this court nor included in the record transmitted to this court.'" *State v. Nunley*, 22 S.W.3d 282, 287 (Tenn. Crim. App. 1999) (quoting *State v. Smith*, 735 S.W.2d 859, 864 (Tenn. Crim. App. 1987)).

While the trial court questioned the validity of the Defendant's rehabilitation program, it further stated that the methodology was not "necessarily [the Defendant's] issue." Moreover, the trial court noted as a positive factor that the Defendant had sought drug treatment following his arrest in this case. Thus, we cannot say that the trial court based its denial on extraneous facts from outside the record because the trial court's questioning of the Defendant's treatment methodology was more of an ancillary comment than a determinative finding. What is more, even if the trial court erred in its reliance on the effectiveness of Subutex as a negative factor, the trial court did not rely heavily on this opinion in reaching its decision, and there were other appropriate considerations relied upon in support of its decision. *Cf. State v. Brooks*, No. W2015-00833-CCA-R3-CD, 2017 WL 758519, at *16 (Tenn. Crim. App. Feb. 27, 2017) (reversing the denial of judicial diversion because the trial court "gave *undue* consideration to the improper evidence, apparently basing its decision in a *large part* on the court's recollection of news accounts of the assault and news accounts concerning the statement made by the [d]efendant during the Commission meeting" (emphases added)).

The Defendant also asserts that the trial court committed reversible error in determining as a negative factor that the Defendant failed to name his drug supplier. To that effect, the Defendant cites this court's decision in *State v. Wright*, No. E2019-01599-

- 8 -

CCA-R3-CD, 2020 WL 7091383, at *10 (Tenn. Crim. App. Dec. 4, 2020). There, this court reiterated its previous observation in *State v. Lee*, stating that "it would be improper for a trial court to deny alternative sentencing based solely upon a defendant's refusal to reveal the names of his sources." *Wright*, 2020 WL 7091383, at *10 (citing *State v. Lee*, No. W1999-01804-CCA-R3-CD, 2000 WL 1840077, at *4 (Tenn. Crim. App. Dec. 14, 2000)). However, the *Lee* court also provided that a defendant's "refusal to cooperate may be relevant in the determination of whether probation would best serve the public and the [defendant]." *Lee*, 2000 WL 1840077, at *4. Further, our supreme court cited *Lee* in support of its affirmance of a trial court's denial of a defendant's early release due to the defendant's refusal to name his source for cocaine he had sold. *State v. Ruiz*, 204 S.W.3d 772, 779 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423 (Tenn. 2018). The *Ruiz* court recognized that a defendant's refusal to identify his drug source may cause concern that the defendant would resume his relationship with that source upon his release. *Id*. The *Ruiz* court noted that "'a refusal to identify the person who supplied the drugs that the [defendant] admittedly sold demonstrates deficiencies in [his] asserted feelings of remorse and contrition, and casts doubt upon his potential for rehabilitation.'" *Id*. (quoting *Lee*, 2000 WL 1840077, at *4).

The Defendant contends here that the trial court failed to directly and specifically ask the Defendant to reveal his sources before making an adverse finding with respect to his potential for rehabilitation. The Defendant was asked on cross-examination from whom he had bought the drugs, and he responded, "The [W]estside [Inn], it was whoever was selling that day at the [W]estside." However, the Defendant contends that this was insufficient for the trial court to make an adverse finding without further questioning of the Defendant. While the Defendant cites to examples in his appellate brief where the trial court made such an inquiry, he does not cite to any cases specifically requiring such to come directly from the trial court or for the inquiry to involve extensive questioning.

In issuing its ruling, the trial court here stated that it gave "the [c]ourt pause" that the Defendant failed to "volunteer his source of supply" and that the Defendant's failure to do so potentially indicated that he was "not finished with selling [m]ethamphetamine or using [m]ethamphetamine either one." When viewing these comments in context, the trial court's ruling in this regard was geared more toward its conclusion that the Defendant was not being truthful and candid with the court rather than reliance on the Defendant's refusal to name his drug source. Thus, we cannot say that the trial court erred by considering the Defendant's refusal to name his drug source when finding him a poor candidate for alternative sentencing. *See State v. Jones*, No. E2001-01639-CCA-R3-CD, 2003 WL 1103185, at *4 (Tenn. Crim. App. Mar. 12, 2003) (holding same and citing cases). At any rate, even if the trial court did improperly find and rely on the Defendant's refusal to reveal

his source, the trial court's decision was supported by other appropriate considerations. *See Wright*, 2020 WL 7091383, at \*10 ("[W]e are constrained to conclude that the trial court did more tha[n] deny diversion *solely* based upon the [d]efendant's unwillingness to reveal the names of the other employees involved.") (emphasis added)).

Here, the Defendant was not a favorable candidate for alternative sentencing options. Although the Defendant was eligible for probation because his actual sentences were ten years or less, he was not a favorable candidate for alternative sentencing as a Range I offender convicted of a Class B felony. *See* Tenn. Code Ann. § 40-35-102(6)(A). Moreover, as noted above, the trial court, in its denial decision, stated considerations other than those the Defendant alleged were erroneous. Specifically, the trial court considered the Defendant's substantial criminal history as "an important negative factor," including the Defendant's multiple convictions beginning when he was a teenager, his service of multiple previous sentences on supervised probation, and his two prior parole violations. The trial court also considered that the Defendant was disingenuous in asserting at sentencing that the methamphetamine was for personal use despite his guilty plea to possession of the drugs for sale or delivery and that the presentence report classified him as high risk for violence. All of these considerations are supported by the record. As a result, we conclude that the trial court did not abuse its discretion in ordering the Defendant to serve his ten-year sentence in confinement. The Defendant is not entitled to relief.

### III.  CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
KYLE A. HIXSON, JUDGE