IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2020

FILED
APR 1 7 2020
Clerk of the Appellate Courts
Rec'd By _____

**STATE OF TENNESSEE v. KEVIN E. TRENT**

**Appeal from the Criminal Court for Claiborne County**
**No. 2014-CR-1918    E. Shayne Sexton, Judge**

_____

**No. E2018-02239-CCA-R3-CD**
_____

The Defendant, Kevin E. Trent, was convicted in 2015 upon his guilty plea of vehicular homicide by intoxication, a Class B felony. *See* T.C.A. § 39-13-213 (2010). The Defendant pleaded guilty as a Range I, standard offender and agreed to an eight-year sentence. The manner of service of his sentence was reserved for the trial court's determination. On appeal, the Defendant contends that the trial court erred by imposing incarceration rather than an alternative sentence. We reverse the judgment of the trial court and remand the case for the entry of an amended judgment reflecting the sentence of split confinement of time served and the remainder on probation. Upon remand, the trial court is to determine the appropriate conditions of probation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Leif Ericson Jeffers, District Public Defender; and Robert Scott (on appeal and at sentencing) and Latasha Wasson (at sentencing), Assistant District Public Defenders, for the appellant, Kevin E. Trent.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to a 2012 traffic crash in which the Defendant's truck struck the vehicle being driven by Karen Freeman, who was significantly injured during the crash and ultimately died months later as a result of her injuries. At the original sentencing hearing on April 20, 2015, the trial court ordered the

Defendant to serve his sentence in confinement. On appeal, this court summarized the facts from the guilty plea hearing and sentencing hearing as follows:

> . . . According to the presentence report, the defendant was driving under the influence of oxycontin and alprazolam on May 3, 2012, and he crossed the center line of the highway, striking the car of the victim, Karen Freeman.

> A grand jury indicted the defendant for vehicular homicide by intoxication and driving under the influence ("DUI"). Thereafter he pled guilty to the vehicular homicide charge, and the DUI charge was dismissed. The record indicates that the defendant stipulated, despite a lack of memory, that his vehicle collided with the victim's and that the State had proof that he was intoxicated because the level of oxycodone in his system was above therapeutic levels. The defendant also stipulated that his intoxication led to the accident and the victim's death based upon the proof that the State had. Pursuant to an agreement, he received an eight-year sentence as a Range I offender, but the manner of service was left to the discretion of the trial court. . . .

> The victim's mother testified that her daughter was traveling to school on the afternoon of the accident in order to pick up two of her four children. After receiving a call from the school that the children had not been picked up, the family learned that the victim had been involved in a serious accident. The victim received critical injuries in the wreck and was hospitalized for over two months. Afterwards, the victim was transferred to a nursing home, where she remained for a year and a half before dying of injuries caused by the accident. According to her mother, the victim lost a finger, had rods inserted in her legs, lost the use of her hands, had a tracheotomy and a feeding tube, suffered from a brain injury, and was unable to speak. The victim had to be bathed and turned in her bed, as she was unable to perform these actions on her own.

> . . . Ms. Peggy Holt, was the manager of the Springdale Pic N Pay, a store that the defendant frequented. She testified that she had seen the defendant drive to the store multiple times and that he usually sent someone in for his purchases. On the day of the accident, Ms. Holt witnessed the defendant drive away, almost hitting the canopy pole in front of the store.

> Ms. Holt testified that because of the defendant's disability, she had approached the defendant in his truck on prior occasions and noted that he

-2-

was not attentive and had slow, slurred speech. She said that she did not see any sort of handicap accommodations inside the defendant's truck.

Through the testimony of the three defense witnesses, Rick Leonard, Tim Trent, and the defendant, it was established that the defendant had been involved in a prior accident in June of 2005. In that accident, the defendant was traveling on a motorcycle when an intoxicated driver pulled out in front of him. The defendant and his motorcycle slammed into the driver's side of the car. As a result of the accident, the defendant lost his left leg and both arms from the elbow down. He spent multiple months in the hospital and a rehabilitation facility. He was prescribed oxycodone and Xanax during this period. After the accident and treatment, he continued to take those medications. The motorcycle accident was determined to be the fault of both the intoxicated driver and the defendant's speed.

Prior to the motorcycle accident, the defendant had graduated from high school and was working forty hours per week, in addition to mowing thirty to forty yards. It was also established that that defendant had no additional interaction with the law and no arrests until his arrest in the instant case. The defendant, his friend, and his father all testified that the defendant very rarely drank alcohol, and the defendant testified that he tried marijuana only one time and did not care for it.

After the motorcycle accident and subsequent treatment, the defendant stayed with his father because he was unable to take care of his personal needs. He was also unable to continue his employment and began receiving Social Security disability benefits. However, he was able to continue mowing some lawns on his zero turn mower and to drive his vehicle again beginning in December of 2005. According to both the defendant and his father, after the motorcycle accident, they contacted the driver's license agency and were informed that the defendant did not need a restricted license because of the loss of his limbs unless special adaptations were required for him to be able to drive his vehicle. According to the witnesses, the defendant was able to drive without such adaptations. He had a prosthesis but did not utilize it, as it was painful. The defendant's father testified that he often rode with the defendant and felt comfortable doing so, even stating that the defendant was a better driver than he himself. Mr. Leonard had witnessed the defendant driving, but he did not ride with him because the defendant's impairment made him uncomfortable. The defendant had not been involved in any other motor vehicle accidents from December 2005 until May of 2012, when the accident that is the subject of this case occurred.

Both Mr. Leonard and the defendant's father testified that the defendant was a "normal" person who cared about people and who liked to hunt and fish. His father testified that the defendant was a hard worker and tried to take care of himself as much as possible, even after the motorcycle accident. He learned to adapt to his limitations and was able to feed himself, get in and out of his wheelchair, get his wheelchair in and out of the truck by himself, and could still hunt and fish with adaptations made to his gun. Mr. Leonard and the defendant's father were both aware that the defendant took prescription pain medications, but each stated that the defendant's speech was not normally slurred. His father noted that if the defendant was using smokeless tobacco, he was sometimes difficult to understand. The defendant's father also stated he had no concerns about the defendant's abusing his pain medication. Each man also noted that the defendant felt great remorse over his involvement in the death of the victim.

The defendant testified that he had no memory of the accident whatsoever. He also could not recall the few weeks prior to or after the accident, stating he woke up in the hospital with no idea as to what had happened.

With regard to his pain medication, the defendant testified that his prescribed dosage had increased over the years following the motorcycle accident. He testified that he spoke with his doctor about the side effects of the medications, but he could not recall the doctor's name. He stated that he currently received his medications from a pain management clinic. With regard to the usage of his medications, the defendant testified that he normally took them as prescribed. However, he acknowledged that, if he were hurting very badly after a particularly active day, he would take an extra pill. He stated that he only took an extra pill when he was at home, not while he was driving. While acknowledging that the State had tested his blood after the accident and that the results indicated his levels were above therapeutic levels, he had no recollection of how or why this occurred. He further testified that, despite his stipulation, he could not actually say that the medication he was taking had caused the accident. He stated that he pled guilty as such only because the State had a report which stated that his levels were elevated.

The defendant also testified that he had driven a vehicle three times after the wreck that claimed the victim's life. He stated that he had driven with the same limitations for a number of years, and he actually still

believed himself to be a safe driver. He acknowledged, however, that if he were given an alternative sentence, he would no longer be allowed to drive.

. . . .

. . . The [trial] court . . . concluded that the sentence should be served in incarceration in order to avoid depreciating the seriousness of the offense.

*State v. Kevin E. Trent*, No. E2015-00753-CCA-R3-CD, 2016 WL 3996467, at *1-3 (Tenn. Crim. App. July 21, 2016). This court reversed the judgment of the trial court after concluding that that the record did not support the trial court's imposition of incarceration and denial of alternative sentencing on the basis that the offense was "'especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree.'" *See id.* at *6 (quoting *State v. Bottoms*, 87 S.W.3d 95, 103 (Tenn. Crim. App. 2011)). This court ordered that the Defendant serve the remainder of his sentence on probation. *See id.* at *8. Our supreme court determined that the trial court "did not undertake the proper analysis before imposing a sentence of incarceration" and expressed its concern that the trial court ordered incarceration based on the elements of the offense. *State v. Trent*, 533 S.W.3d 282, 295-96 (Tenn. 2017). However, the court determined that the record was too incomplete for this court to have performed an independent appellate review and to have ordered the Defendant to serve the remainder of his sentence on probation. *Id.* at 296. Our supreme court ordered a new sentencing hearing.

At the new sentencing hearing on November 21, 2018, a new presentence report was received as an exhibit. The report reflected that the Defendant was age thirty-three at the time of the presentence investigation, that he did not have any previous convictions, and that he was determined to be a low risk for recidivism. When describing the events of the offense, the Defendant told the presentence investigator that he "had a really bad accident and someone ended up dying. I am still trying to cope with it." The Defendant had graduated from high school, and he stated that he had not received any mental health and substance abuse treatments. He reported having excellent mental health and having a good relationship with his family. The Defendant lived with his father at the time of the investigation. He reported becoming physically disabled after a motorcycle accident in which both arms at the elbow and his left leg were amputated. He began receiving Social Security benefits afterward. The Defendant's prescribed medications at the time of the investigation were oxycodone and Percocet. The Defendant stated that he drank alcohol rarely, that he was age twenty-one when he first drank alcohol, and that he last drank alcohol in 2018. Regarding his frequency of drinking alcohol, the Defendant stated, "[S]ix months." He admitted using marijuana once and becoming sick afterward.

-5-

The Tennessee Bureau of Investigation toxicology report was received as an exhibit. The report reflected that on May 3, 2012, at 6:40 p.m., the Defendant's blood was negative for alcohol, barbiturates, cannabinoid, and cocaine but was positive for oxycodone and alprazolam, otherwise known as Xanax. The amount of oxycodone was "0.22 ug/ml," and the amount of alprazolam was "63.5 ng/ml."

Claiborne County Sheriff Robert Brooks testified that at the time of the crash he worked for the Tennessee Highway Patrol and that he responded to the scene. He described the scene as a violent head-on collision between the Defendant's truck and the victim's vehicle. He said that the victim, who was still inside her vehicle, suffered severe trauma to her head and hand and that the Defendant suffered injuries, as well.

Sheriff Brooks testified that when two vehicles collided during a crash, the vehicles "go down," causing "gouge marks" in the roadway pavement. He said the gouge marks indicated "when the impact" occurred. He said that his investigation showed that the Defendant's truck crossed the center lane and struck the victim's vehicle. He agreed the Defendant drove in the left lane, otherwise called the "fast lane," crossed into the turn lane, and went into the victim's lane of travel. He agreed that the victim was traveling in the opposite direction and that her vehicle was in the left lane at the time of the impact. Sheriff Brooks's accident report and scene diagram were received as exhibits.

Judy McGeorge, the victim's mother, testified at the original sentencing hearing but had died before the new sentencing hearing. A transcript of her testimony was received as an exhibit without objection from the Defendant.

Peggy Holt provided testimony consistent with her testimony at the original sentencing hearing regarding the Defendant's frequenting the convenience store at which she worked. She said that the Defendant had never entered the store and that whoever was with the Defendant entered the store on his behalf. She said for the first time, though, that on the day of the accident, she left the store to talk to the Defendant about returned checks. She said that the Defendant sat in the driver's seat of his truck. She said that the Defendant had "low" and slurred speech and that when he drove out of the parking lot, his truck almost hit "the canopy pole." She recalled that she talked to the Defendant around the time of shift change, which was noon.

Ms. Holt testified that, after the Defendant left the store, Sheriff Brooks entered the store and that she told the sheriff what she had seen. She could not recall if she spoke to the sheriff before or after the crash occurred, but she knew they spoke on the same day. She said that although the Defendant's speech was low and slurred, he appeared normal based upon their previous interactions. She said that she had seen the Defendant once at the store since the crash and that the Defendant had not driven.

On cross-examination, Ms. Holt was presented with her testimony from the original sentencing hearing, in which she testified that she did not leave the store to speak with the Defendant. She stated that she misspoke at the previous hearing.

Gregory Davis, an expert in forensic toxicology, testified that he had reviewed the accident, the presentence, and the toxicology reports. He said that the Defendant's blood alprazolam concentration of 63.5 nanograms per millimeter was, depending upon the research upon which one relied, considered by the International Association of Forensic Toxicology to be above or at the upper end of the therapeutic range. He said that the Defendant had an "active drug" of alprazolam circulating in the bloodstream at the time of the blood draw and that whether the amount of a drug was within the therapeutic range had nothing to do with whether a person could drive a car or perform complex tasks.

Dr. Davis testified that the Defendant's blood oxycodone concentration level was 0.22, that the therapeutic range was 0.005 to 0.05, and that the Defendant's level was approximately "three times" the upper limit of the therapeutic range. Dr. Davis said that it was possible the Defendant took his medication as directed and that he had not reviewed the Defendant's medical records. Dr. Davis said that he would have expected the Defendant to experience "some central nervous system depressant effect" but that he did not know the extent because he did not know the Defendant's tolerance level.

Dr. Davis testified that oxycodone and alprazolam were both central nervous system depressants, which meant that both medications decreased the brain's ability to function. He said that these medications had "some degree of central nervous system depressant effect" on the Defendant. Dr. Davis said that although he could not predict specific behaviors based upon drug level, slurred speech would have been consistent with taking both medications simultaneously. On cross-examination, Dr. Davis testified that if a patient had been dealing with "extreme pain management issues" and increased dosages of these two medications gradually, the patient would not feel the effects of the medications and would have less central nervous system depression.

Probation Officer Sara Houser testified that the "Strong R assessment" was a tool used by the Board of Probation and Parole to assist in determining the level of appropriate supervision. The Defendant's Strong R assessment was received as an exhibit. Ms. Houser said that the Defendant reported having never drank alcohol and having never used drugs and that the Defendant's response impacted the assessment. She said that, generally, supervision would not require drug and alcohol assessment for a defendant who did not report drinking alcohol and using drugs and would require fewer drug screens. She said that the Defendant reported having no threatening, aggressive, and violent behaviors in his life but that "a DUI-related charge," including vehicular homicide, was considered violent behavior for purposes of the assessment.

Ms. Houser testified that the Defendant submitted to a drug screen on August 4, 2017, but later stated that he was "medically unable" to undergo the test. She said that on November 2, 2017, the Defendant either could not produce a sample for testing or did not report to his probation officer. She did not know which occurred and said that she was not the Defendant's supervising officer. She said that the Defendant first reported to the probation office in November 2016 after his release from prison following this court's previous grant of probation and that the Defendant had reported to the office on November 11, 2018, August 9, 2018, May 17, 2018, and December 7, 2017. The records received as an exhibit showed that a home visit had been completed and that the Defendant and the probation officer had "face to face contact in [the] field."

The prosecutor asked Ms. Houser whether she could "say with a straight face this [was] really supervision," and she responded, "No." She said that although she was not his supervising probation officer, she would have required the Defendant to report to the office and to submit to drug screens more frequently. She said that, based upon the information she received, she could not determine if the Defendant was "doing well on probation."

On cross-examination, Ms. Houser testified that the Defendant did not have previous criminal convictions. She was unsure whether the person conducting the R assessment had asked the Defendant if he had ever in his lifetime drank alcohol and used drugs or if the question referred to his use at the time of the assessment. She agreed the Defendant had been candid throughout this case that he became sick after smoking marijuana once and that he drank beer "sometimes" when watching the Super Bowl. She agreed there could have been confusion about the focus of the question related to previous alcohol and drug use. She did not know whether the person conducting the assessment told the Defendant that his vehicular homicide conviction would have been relevant to whether the Defendant had previously engaged in violent behavior. She did not know whether the Defendant would have received assistance in submitting a urine sample for a drug screen based upon his physical disabilities of having lost both of his arms at the elbow.

Ms. Houser testified that her file did not show the Defendant had failed to report to his probation officer. She agreed the Defendant had complied with all that he had been asked to do by his probation officer.

Tim Trent, the Defendant's father, testified that he had lived in Cocke County with the Defendant for about ten years. Mr. Trent described the Defendant as outgoing and said the Defendant had never been in trouble before this case. He said that the Defendant drank little alcohol and did not use drugs and that Mr. Trent did not have concerns that the Defendant overused his medications. Mr. Trent was unaware of the Defendant's

-8-

previous statement that he might take an extra dose of pain medication after having mown lawns. Mr. Trent said that before the motorcycle accident, the Defendant worked fulltime at a factory and mowed approximately thirty-five to forty lawns after work.

Mr. Trent testified that since the motorcycle accident, the Defendant required assistance with dressing, bathing, eating, and using the bathroom. Mr. Trent said that he spoke to someone at the "driver's license place" after the motorcycle accident, that Mr. Trent inquired about the Defendant's ability to drive, and that Mr. Trent was told the Defendant's driver's license was valid "as long as we didn't have to put nothing on his vehicle for him to drive." Mr. Trent said that the Defendant did not require special accommodations to drive and that the Defendant adjusted the seat in order for the Defendant to reach the steering wheel with his arms. Mr. Trent said that the Defendant was a safe driver.

Mr. Trent testified that the Defendant had not driven a vehicle since his release from confinement in 2016. Mr. Trent said that he or another family member drove the Defendant to meet with his probation officer.

Upon questioning by the trial court, Mr. Trent testified that he went to the Department of Safety to inquire about the Defendant's driving when the Defendant was released from the hospital following the 2005 motorcycle accident. Mr. Trent said that the Defendant did not have a valid license at the time of the sentencing hearing.

The Defendant testified that before the motorcycle accident, he had a full-time factory job in addition to mowing thirty to forty lawns. He said that before this case, he had two speeding tickets. He said that he and the other motorist involved in the motorcycle accident were determined to be at fault equally, that he thought he had been speeding when the accident occurred, and that the other motorist had been intoxicated and had pulled out in front of him. The Defendant said that initially he was depressed about his injuries but that he ultimately "got back to doing what [he] used to do, never looked back, just [tried] to stay busy so I don't think about it." He said that the year following the accident, he returned to mowing lawns with the aid of a zero-turn mower.

The Defendant testified that he did not have to modify his truck to drive and that he was able to start the engine, open the door, place his wheelchair inside, and steer with either arm. He said that he renewed his driver's license at the Department of Safety and that the employees were aware of his physical condition but "said nothing about [his] disability." He said that, at the time of the crash in this case, his valid license did not have restrictions.

The Defendant testified that he had been prescribed pain medication since the 2005 motorcycle accident. He said that around the time of the 2012 crash in this case, he

mowed lawns three to four days per week and that his chronic pain levels increased with his level of activity. He said that when he mowed lawns, the pain was worse and that he might have taken an extra pill at bedtime but never in the mornings. The Defendant testified that he did not recall the crash in this case and that his last memory was about one month before it occurred.

The Defendant testified that he thought about the accident and prayed for the victim's family daily. He said that he had nightmares and that he wished he had died rather than the victim because her children would grow up without their mother.

The Defendant testified that he spent sixteen months in prison before being released on probation at this court's instruction. He said that confinement was "bad." He said that he went nine to ten days without bathing, that he was "beat up by a guard," and that he "had to eat like a dog because they didn't have enough nurses" to feed him. He said that during his time in confinement, he thought about the seriousness of the offense.

The Defendant testified that he had been released on probation since August 2016, that he had complied with every requirement, and that he had never rescheduled an appointment with his probation officer. He said that his inability to provide a urine sample for a drug screen was related to his inability to hold the specimen cup as a result of his not having hands. He said that "every time they ask me for [a sample] they don't have a nurse. They write it down because they can't hold the cup for me, the officer can't." He said the issue had never been his inability to provide a sample for a drug screen. He said that if a nurse were not present to hold the specimen cup, the drug screen was not performed because the probation officer would not hold it.

The Defendant testified that he did not recall telling anyone that he had never drunk alcohol or used drugs and that he had "always been up front" with everyone. He agreed that his statement in the original presentence report that he rarely drank alcohol and smoked marijuana once was accurate. He denied attempting to "pull the wool over the probation officer's eyes" and said that, from the beginning, he had reported trying marijuana once and drinking alcohol rarely. He said that he would comply with any probation reporting requirements, including weekly reporting.

On cross-examination, the Defendant said that reporting to his probation officer was required and that, at the time of the sentencing hearing, he reported every three months. He said that, at one point, he reported monthly to his probation officer and that he did not have transportation issues. He admitted that the crash was his fault and that although he could not recall the day of the crash, he denied he had been "high" previously. He said that the only time he smoked marijuana, he became sick, not high. He said that he took the pain medication to relieve his chronic pain and that he did not know if the medication made him high. He said, "I mean, I guess it would." He said

-10-

later that he knew he took too much medication sometimes but that he would not call it "high." He agreed that intoxicated was probably an accurate description. The Defendant agreed that he and Ms. Holt had previously discussed his writing a "bad check" but that he did not recall discussing it on the day of the accident. He recalled speaking to her only twice. He said that he wrote a check for "gas and stuff," that his disability benefit was going to be deposited into his bank account the next day, and that Ms. Holt "let it go on through" after she called his bank to confirm the next-day deposit.

The prosecutor stated that after the accident in this case, the Defendant became a "drug addict," and the Defendant responded that although he took pain medication daily to treat his chronic pain, he never thought of himself as a drug addict. Although he said that he probably took too much medication on the day of the accident, he denied taking too much medication regularly. He said that he drove once since the accident because a Tennessee Highway Patrol officer told him to drive his friend's truck home from Sevierville. The Defendant explained that the officers were "checking seatbelts," that the officer learned the friend's driver's license had been revoked, and that the officers told the Defendant to drive the truck home because the Defendant's license had been valid. He clarified that that this was before the victim died and before he was charged with a crime.

On redirect examination, the Defendant testified that his tolerance of pain medication increased over time and that he did not think "it was a problem." He acknowledged, though, that his medication created a problem for driving and that he did not realize it at the time of the accident. He said he had never hurt anyone before this incident. He said that he had not driven a vehicle since his arrest.

Upon examination of the trial court, the Defendant testified that at the time of the offense, he had been prescribed oxycodone and Xanax, which he said was for post-traumatic stress disorder associated with his motorcycle accident. He said that he had been prescribed both medications in 2005 but that Xanax had since been discontinued. He was unsure when his prescription for Xanax ended but said he had neither been prescribed Xanax when he was in prison nor since his release from confinement. He said that the prison medical staff prescribed something for depression for "a little while." When the court asked why the Defendant had not been prescribed Xanax at the time of the sentencing hearing, the Defendant said his current physician told him he "had to go to Cherokee to get it . . . if I wanted it back." He said he had not been treated at Cherokee at any time and declined to go there to obtain a Xanax prescription. He said that before he went to prison, his pain management physician prescribed Xanax.

On recross-examination, the Defendant testified that his pain management physician, to whom the Defendant was referred by his family physician, had prescribed oxycodone and Xanax at the time of the accident, that he changed physicians after the

-11-

accident because the pain management clinic closed, and that the subsequent physician prescribed Opana but not Xanax. He said that he was still prescribed oxycodone but that he did not drive. He said that he now only mowed two lawns, that his pain level was lower because he was not mowing as many lawns as he had previously, and that he did not have "the issues [he] had previously with having to overuse."

Relative to the time the Defendant had been released on probation, the trial court stated that nothing could "really be gathered from the supervision so to speak that he has been under . . . . We see it time and time again in this Court where some just kind of skate around." The court stated that it would not weigh this against the Defendant because it was a failure of "the department," not the Defendant.

The court stated the following regarding the facts of this case:

> . . . [W]hat I have seen and what I have heard reflects the culture of medicated drivers, and its this idea that, I can get – and, you know, the – Mr. Trent is – clearly has physical issues that would prevent – that would keep most of us from even thinking about driving, yet he did and just has continued to some extent, at least one time since the wreck – since the wreck that we're here on today. I don't know how to impress upon the public that if you're impaired . . . , you owe a duty to everybody on the road to not drive under impairment. You know, we kick around addiction, you kick around drunk, that sort of thing. Impaired is impaired. . . . And the fact that a doctor hands [a prescription] out, whether it came from a pain clinic or a very reputable physician, you don't get to drive. You simply don't get to. It's – it needs to come to a strict liability standard. That's – if I had anything to do with it, that's where I would put it. You do not get to endanger other people by your lawfully prescribed medications. It should be simple as that, but the attitude is, well, doctor gave it to me. And I'm not – you know, I'm not trying to yell at Mr. Trent here. That is the culture that I am seeing and to some extent, I'm speaking to that culture. If there were some way to deter that, I would . . . . But, Mr. Trent comes in today with the same mindset that, you know, I don't think I was that impaired, but – I think he went back and forth on that. To this moment, I don't think Mr. Trent has understood the gravity of his . . . actions.

The trial court found, based upon the presentence report, that the Defendant drank alcohol in 2018. The court determined that drinking alcohol was a lawful activity, except when a person had post-traumatic stress disorder and took oxycodone, and that post-traumatic stress disorder did not "magically go away." The court took issue with the Defendant's choosing not to obtain treatment from Cherokee in connection with his post-traumatic stress disorder and stated that this was "a strike against his ability for rehabilitation." The court determined that the Defendant would not "seek the treatment

-12-

that he was offered and told to get" and that the Defendant decided to stop taking Xanax and to drink alcohol, which the court concluded was a "hard blow" on his efforts to remain on probation.

The trial court determined that the Defendant was "behaving" to the extent that he had no criminal history before the offense, although he had tendered worthless checks and had been driving. The court said that "couple that with mowing yards, and this was deeper." The court stated, "There was something at that time going on with Mr. Trent that was deeper, and nobody is – we're not really talking about it, maybe we'll never get to the bottom of it, but it doesn't – that does not suggest this is a good case for probation." The court determined that "nobody is owning those behaviors" and that, as a result, "I don't think Mr. Trent sees any need for correction." The court concluded that the Defendant needed to serve the remainder of his sentence in confinement.

The trial court initially determined that the facts of the case, although "horrible," did not warrant a denial of alternative sentencing. The court noted that the death of the victim was an element of the conviction offense. The court determined, based upon the presentence report, that the Defendant had continued to drink alcohol, that the Defendant reported excellent mental health although he reported having been diagnosed with post-traumatic stress disorder, and that the Defendant had chosen not to treat his disorder. The court determined that the Defendant's "refusal to deal with" the post-traumatic stress disorder at Cherokee told the court "a great deal about the likelihood of his rehabilitation." The court found that the Defendant was "not acknowledging his issues." The court stated that "[t]his is just inevitable . . . when you overmedicate."

The trial court determined that the Defendant had a lack of criminal history and did not consider the Defendant's admitted single use of marijuana. Relative to whether the Defendant could abide by the terms of probation, the court determined that his release from prison had been "pretty easy" but that "it just remains to be seen whether or not he could do that." The court stated that it "sounds as if it's very problematic in having him report and provide the necessary information for the probation department."

The trial court determined that the Defendant had not caused "[a] lot of harm to people" but that the Defendant had a "lack of cognizance of this drug issue." The court hesitated to label the Defendant an addict but said that although the Defendant "may well be in pain," "a lot of his is just choices . . . what you take, when you take it, why you take it." The court stated that it continued to return to the Defendant's behavior because although the Defendant was not a "career offender," the Defendant lacked self-awareness on his drug use and "might do this again." However, the court determined that no measures of confinement had been applied unsuccessfully to the Defendant.

-13-

In considering the seriousness of the offense, the trial court stated that "these types" of cases were going to increase and that the seriousness of the offense could not be "underestimated." The court noted this case had been preventable and tragic and said, "I'm gonna make sure that what I do in this case does not unduly depreciate the seriousness of the offense." The trial judge stated,

It happens over and over . . . [let's] compare it to the old alcohol driving day versus now. There's . . . some history behind the alcohol drivers. I think they kind of know what they're doing [is] wrong. The medicated drivers don't. They don't see it as wrong. And from that standpoint . . . , making a point to the public that medicated drivers are the same as liquor, beer drivers, it's the same thing. And I'm gonna make sure that I do not unduly depreciate the seriousness of the offense.

Relative to providing an effective deterrent, the trial court noted that the State had not provided any evidence but that the court was aware that

the cases that have become relative on alcohol versus drug, drugs have gone way upwards in the climb. If you have a hundred cases, what used to be 80 alcohol, 20 drugs, now it's about 55/45 drugs to alcohol. And from that standpoint, this type of sentence hopefully will have a deterrent effect on those who might engage in that conduct.

The court further stated that "whether the offense was enormous [sic] gross or heinous, . . . what's happened, it speaks for itself." The court concluded that the Defendant was not a good candidate for alternative sentencing and ordered him to serve the remainder of his sentence in confinement.

Although the trial court did not address mitigating and enhancement factors at the sentencing hearing, the written order reflects that the court applied a single enhancement factor after determining that the personal injuries inflicted upon the victim were particularly great. *See* T.C.A. § 40-35-114(6) (2018). The court did not provide reasoning for its application of this enhancement factor. The order does not reflect that that the court considered or applied any mitigating factors. This appeal followed.

The Defendant contends that the trial court erred by denying his request for alternative sentencing. The State responds that the court did not abuse its discretion by denying probation.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report,

-14-

the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2018). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2018); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

The trial court denied alternative sentencing based upon the needs to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others who might commit similar offenses. *See* T.C.A. § 40-35-103(1)(B). The trial court did not discuss or render any factual findings regarding the Defendant's commission of the offense in connection with the seriousness of the offense, but the court determined that the facts of this case did not warrant the denial of alternative sentencing. We conclude that the record supports this determination. The court, though, applied enhancement factor (6), that the injuries inflicted upon the victim were particularly great, without explanation in its written order. Although the court did not explain its reasoning for applying factor (6), this factor is not applicable in sentencing for vehicular homicide because death of the victim is an element of the offense. *See State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995); *see also* T.C.A. § 40-35-210(e) (2018). The court erred by applying factor (6).

The record reflects relative to the nature and circumstances of the offense that Sheriff Brooks described the scene as a violent head-on collision in which the victim suffered extensive injuries that ultimately resulted in her death. Sheriff Brooks stated that his investigation showed that the Defendant's truck was traveling in the left lane, crossed into the turn lane, and drove into the victim's lane of travel, which was the left lane in the opposite direction. This description reflects that the Defendant and the victim were traveling on a four-lane highway separated by a turn lane and that the Defendant had crossed two lanes at the time of the collision. However, Sheriff Brooks's diagram of the scene does not reflect that the four-lane highway was divided by a turn lane and indicates the Defendant crossed only one lane of travel. Although the record is inconsistent relative to whether the Defendant crossed one or two lanes of travel, the Defendant does not dispute that his truck left his lane of travel, striking the victim's vehicle and causing her death. The motor vehicle accident report reflected that the collision occurred when the Defendant negotiated a curve and failed to stay in the proper lane, that there were no distractions at the time, that he had incapacitating injuries and had to be extricated from

-16-

his truck, and that his first condition "appeared normal." The report reflected that no drugs were present in the Defendant's truck. The report did not estimate the Defendant's speed at the time of the crash but stated that the speed limit was fifty-five miles per hour. The report reflected that the Defendant and the victim were each transported to a hospital by "EMS-Air." We note that the witness identified in the report did not testify at the sentencing hearing.

Furthermore, the toxicology report and Dr. Davis's testimony showed that the level of alprazolam in the Defendant's bloodstream was at the upper end of or above the therapeutic range, depending upon which research one relied, and that the level of oxycodone was approximately three times the upper limit. *See id.* § 39-13-213(a)(2) ("Vehicular homicide is the reckless killing of another by the operation of [a motor vehicle], as the proximate result of . . . [t]he driver's intoxication, [which] includes . . . drug intoxication[.]").

However, Dr. Davis had not reviewed the Defendant's medical records and could not determine the Defendant's level of impairment because of the Defendant's long-term pain management treatment that involved increasing dosages and tolerance over time. The accident report reflected that the Defendant "appeared normal" at the scene, and it is undisputed that the Defendant had received pain management treatment for approximately seven years at the time of the accident in this case. Dr. Davis expected, though, that the Defendant suffered from some level of impairment, or "depressant effect." Dr. Davis did not provide evidence about the amount of medication the Defendant would have been required to consume to reach the levels reflected in the toxicology report, and the evidence did not reflect whether the Defendant had been advised by his medical and pharmaceutical providers not to drive when taking the medications. Although the Defendant's last memory was about one month before the accident, he did not dispute that he consumed too much medication on the day of the accident and that he caused the victim's death.

However, the record reflects that the trial court's focus in denying alternative sentencing in connection with the seriousness of the offense and providing a deterrence was, in part, what the court considered a culture of medicated drivers. The court determined, without evidence, that "these types" of cases were increasing in frequency and that the seriousness of these cases could not be "underestimated." The court determined, also without supporting evidence, that drug-related offenses had increased significantly and speculated that "what use to be 80 alcohol, 20 drugs, now it's about 55/45 drugs to alcohol." The court stated, without legal authority, that regardless of whether a person obtained a prescription from a pain management clinic or a "reputable" physician, driving while using a prescription pain medication "needs to come to a strict liability standard." The court stated this case had been preventable and tragic. The court

determined, again without evidence relative to this case, that drivers impaired by alcohol "kind of know what they're doing is wrong" and that drivers impaired by medication "don't see it as wrong." The court's conclusions and determinations, however, are not based upon the evidence presented at the hearing but, rather, upon speculation and personal opinions. In the previous appeal, our supreme court cautioned the trial court that the killing of a driver by a defendant impaired by medication is alone insufficient to deny probation because the legislature determined that the offense is probation-eligible. *Trent*, 533 S.W.3d at 293 ("[W]e are concerned that [the trial court] may have ordered incarceration based simply upon the elements of the crime in spite of our legislature having provided that persons who commit vehicular homicide by intoxication are eligible for probation.").

The presentence report reflects that the thirty-three-year-old Defendant had no previous involvement with law enforcement, that he was at low risk for recidivism, that he had complied with the requirements of probation since his release from confinement in August 2016, and that he had been supervised in the community for approximately two years and three months at the time of the new sentencing hearing. However, the trial court determined that the Defendant was not amenable to correction.

The State's position at the sentencing hearing was that although the Defendant had complied with the terms of his probation, the supervision was insufficient to weigh in favor of continued probation. The trial court appeared to agree, finding that his release had been "pretty easy" and that it "remain[ed] to be seen whether he could do that." The court determined that it "sound[ed] as if it's very problematic in having him report and provide the necessary information for the probation department." The evidence does not support these determinations.

Probation Officer Houser testified at the sentencing hearing, but she did not supervise the Defendant. Melvin Norris, who did not testify, was the Defendant's supervising probation officer. The initial focus of Ms. Houser's testimony was to explain that the R assessment conducted periodically and in conjunction with the presentence report was used to understand and to better supervise a defendant. According to her testimony, the probation officer read the questions to the Defendant and that the officer would have noted the Defendant's responses. The assessment reflected that the Defendant reported having never used drugs and alcohol. However, Ms. Houser did not know whether the questions were addressing the time of the assessment or during the course of the Defendant's life. The Defendant admitted in the two presentence investigations that have been conducted in this case that he first drank alcohol at age twenty-one, that he drank alcohol rarely, and that he had smoked marijuana once, became sick as a result, and never used it again. Ms. Houser agreed that the Defendant had been candid about this information and about his long-term pain management treatment and

-18-

conceded there could have been confusion about the focus of the questions related to alcohol and drugs.

The questions contained in the assessment related to drugs and alcohol were general and included questions regarding "drug or alcohol use problems" within a defendant's lifetime and the previous six-month time period. These questions presume and relate to *substance abuse problems* in connection with alcohol and controlled substances. The Defendant reported never having had a drug or alcohol use problem, which is supported by the evidence, not that he never drank alcohol or smoked marijuana. In 2005, the Defendant suffered debilitating injuries that resulted in the loss of his left leg and both of his arms below the elbow. As a result, the Defendant has continued to receive long-term pain management treatment to relieve his pain. The parties do not dispute the legitimacy of the Defendant's injuries and his chronic pain, and the trial court did not discredit this evidence. The Defendant's long-term pain management treatment alone is insufficient to establish that the Defendant has a substance abuse problem, although the trial court determined that the Defendant had a "lack of cognizance of this drug issue," saw no "need for correction," and "might do this again." The trial court's observations and conclusions are based upon the court's speculation about the Defendant and are not established by the evidence presented at the sentencing hearing.

Although the Defendant admitted that the amount of pain medication he consumed depended upon his activity level, which was high at the time of the accident, and that he probably took too much medication on the day of the accident, the evidence does not support a conclusion that the Defendant answered the drug and alcohol use problem questions untruthfully or with the intent to deceive. At the hearing, the Defendant denied regularly taking too much medication before the crash and stated that his medication did not create "a problem" generally but that he realized after the crash that his medication created a problem for driving a vehicle. Therefore, the Defendant acknowledged that he could not drive when consuming pain medication. Although the Defendant had a valid driver's license at the time of the crash, the Defendant did not have a valid license at the time of the new sentencing hearing and had not driven since the victim's death, which occurred an extended period of time after the crash occurred. The critical criminal conduct in this case is driving when intoxicated by medication, not simply consuming pain medication obtained by lawful means, and the evidence reflects that while the Defendant continues to treat his chronic pain, he has, as required by statute, surrendered his driving privileges and demonstrated he will no longer drive a vehicle as a result of his medication. These facts support a conclusion that the Defendant has little likelihood of recidivism.

The State likewise presented evidence related to the Defendant's response to the R assessment question regarding his previous display of threatening, aggressive, or violent behavior. The Defendant's responded that he had not engaged in any threatening,

-19-

aggressive or violent behaviors in his lifetime. The Defendant had no previous criminal history before the present case, and there is no indication that the Defendant should have known that the probation office classified his conviction offense as violent conduct, although the offense involved a reckless killing brought about by a driver's intoxication.

Regarding the Defendant's probation supervision, Ms. Houser testified that the Defendant had reported to the probation office each time he was requested, which included five dates between November 2016 and November 2018. Ms. Houser's records regarding drug screens were less than detailed, and she could not explain the lack of information because she was not the supervising probation officer. Regarding one drug screen in August 2017, she initially stated that the Defendant submitted a urine sample but said later that he was medically unable to provide a sample. She could not explain what occurred. The Defendant clarified during his testimony that he was unable to hold the specimen cup because he had no hands and that his probation officer would not hold the cup in order for him to provide a sample in the absence of a nurse. This evidence is not disputed, and Ms. Houser stated that the Defendant had complied with everything his probation officer asked of him and had not missed a report date. The Defendant testified that a family member drove him to meet with his probation officer.

Although the trial court might have been dissatisfied with the level and intensity of the supervision in this case, the record reflects that the Defendant complied with everything requested of him. As a result, the record does not support the court's determination that it had been "very problematic in having him report and provide the necessary information for the probation department." To the contrary, the record reflects that the Defendant reported each time he was told to meet with his probation officer and that he had abided by the terms of his release. His compliance with the terms of his release weighs in favor of continued probation. We note that Ms. Houser testified that she would have required the Defendant to report more frequently and to undergo more frequent drug screens. A recommendation for more intensive supervision is not an adequate basis for denying probation to a Defendant who is already complying with the existing terms of release.

The trial court, likewise, determined that the Defendant was not a suitable candidate for probation because he drank alcohol, which the court said, without evidence, was unlawful when taking pain medication and suffering from post-traumatic stress disorder. The court determined that post-traumatic stress did not "magically go away" and that the Defendant chose not to obtain treatment from Cherokee that he was "offered and told to get." The court also determined that the Defendant chose to stop taking his Xanax and to drink alcohol instead and that the Defendant had chosen not to treat his disorder. However, the court's determinations are not supported by the evidence at the sentencing hearing.

-20-

The Defendant testified that his family physician referred him to a pain management clinic after the 2005 motorcycle accident and that the pain management physician prescribed oxycodone and Xanax, both of which the Defendant was prescribed at the time of the crash in this case. The Defendant testified that Xanax was prescribed for post-traumatic stress related to his motorcycle accident. At some point after the 2012 crash but before the Defendant went to prison, the clinic closed, and the Defendant's subsequent physician discontinued Xanax. The Defendant was not prescribed Xanax when he was in confinement, and, after his release from prison in 2016, his treating physician at the time of sentencing told him that "he had to go to Cherokee to get [Xanax] . . . if [he] wanted it back."

This undisputed evidence reflects that the Defendant's physician discontinued Xanax. The record does not establish that the Defendant unilaterally stopped taking medication to treat post-traumatic stress disorder, that the Defendant was instructed to obtain any type of mental health treatment, and that the Defendant chose to drink alcohol instead of taking Xanax. The Defendant testified that initially after the motorcycle accident, he was depressed about his injuries, that he attempted to stay busy in an effort to think less about his injuries, and that he returned to mowing lawns the following year. The pain management physician placed the Defendant on oxycodone and Xanax after the motorcycle accident, and although the likely inference is that the Defendant suffered some degree of post-traumatic stress disorder, Xanax was later discontinued by a physician. The evidence does not show that the Defendant was referred at any time to a mental health facility for evaluation or that he disregarded instructions to undergo such an evaluation. The evidence reflects that the physician currently prescribing the Defendant's pain medication told the Defendant that if he wanted to resume taking Xanax, it would require an assessment from a different physician. The Defendant testified that he did not resume taking Xanax, which supports other evidence that the Defendant was not a drug addict and that his "present mental health state" at the time of the October 11, 2018 presentence investigation was without concerns. Relative to the Defendant's alcohol consumption, the evidence shows that the Defendant drank alcohol rarely. The October 11 presentence report reflected that the Defendant said he had drunk alcohol within the previous six months. The evidence at the sentencing hearing neither reflects that the Defendant drank alcohol excessively nor that he drank instead of resuming Xanax.

Although the trial court articulated its reasons for ordering the Defendant to serve his sentence in confinement, the evidence contained in the record does not support the court's determinations and conclusions. Likewise, the court erred by applying the single enhancement factor in this case, although the misapplication of an enhancement factor is alone insufficient to vacate a sentence, and the record does not reflect that the court considered any mitigating factors. However, the record is sufficient to allow meaningful appellate review, and we conclude that the Defendant has demonstrated that he is

-21-

unlikely to reoffend, that he is amenable to correction, and that he is a suitable candidate for continued alternative sentencing. We reverse the judgment of the trial court and modify the Defendant's sentence to split confinement of time served with the remainder to be served on probation.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. The case is remanded to the trial court for the entry of an amended judgment reflecting a sentence of spilt confinement of time served with the remainder to be served on probation. The original judgment of conviction and the judgment of conviction in the present appeal reflect that the Defendant has served approximately thirty-two months in confinement. The case is, likewise, remanded for the trial court to determine the appropriate conditions of probation.

_____
ROBERT H. MONTGOMERY, JR., JUDGE