IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

## STATE OF TENNESSEE v. GARY WAYNE FORD

**Appeal from the Criminal Court for Meigs County**
**No. 2015-CR-53     Jeffery Hill Wicks, Judge**

---

### No. E2019-00684-CCA-R3-CD

---

The defendant, Gary Wayne Ford, appeals the Meigs County Criminal Court's denial of alternative sentencing for his conviction of voluntary manslaughter, arguing that the trial court applied an incorrect legal standard, admitted improper rebuttal evidence at the sentencing hearing, and based its decision on unreliable or contradicted evidence. After careful examination of the record, we affirm the trial court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gregory Scott Kanavos, Cleveland, Tennessee, for the appellant, Gary Wayne Ford.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Russell Johnson, District Attorney General; and Lauren M. Bennett, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Meigs County Grand Jury charged the defendant, Gary Wayne Ford, with one count each of second degree murder and voluntary manslaughter arising from the death of Francis C. Turner. In a superseding indictment, the Grand Jury charged the defendant with alternative counts of the second degree murder of the victim. Pursuant to a plea agreement with the State, the defendant entered a plea of nolo contendere to the lesser charge of voluntary manslaughter in count one, and the State dismissed the second count of second degree murder. Under the terms of the agreement, the defendant would be sentenced as a Range I offender with the length and manner of service of the sentence to be determined by the trial court. At the plea submission hearing, the State provided the following statement of facts:

[S]hould this matter have gone to trial, the State would have proven beyond a reasonable doubt that in Meigs County, and in the State of Tennessee, on April 9, 2015, that the defendant Gary Wayne Ford, intentionally or knowingly killed Colleen Francis Turner, in a state of passion produced by an adequate provocation sufficient for any reasonable person to act in an irrational manner . . . ."

We glean the following facts from the Meigs County Sheriff Department's ("MCSD) incident report as stated in the presentence report:[1] On the morning of April 10, 2015, Investigator Alex Clary responded to the defendant's 9-1-1 call in which the defendant stated that he arrived at his home at 1197 Lefew Lane sometime after 6:30 a.m. and found the victim deceased. When Investigator Clary arrived at the scene, he found the deceased victim seated in a chair "wearing panties rolled down around her thighs and a bra." He noticed "visible signs that a physical altercation had occurred" throughout the house, including "a television in the master bedroom that ha[d] been knocked over, contents of an ash tray scattered throughout the living room and a pair of broken eyeglass . . . lying under the entertainment center. The main bathroom had human feces scattered over the floor, vanity and walls" and a "human tooth [wa]s found lying in the feces in the bathroom." The feces "had been stepped in by someone wearing shoes." Investigator Clary noticed bruising, cuts, and scrapes on the victim's body and "a visible scratch on the forehead of [the defendant] 'that appears to have been made by fingernails.'"

The defendant told the police that the victim arrived at his house at approximately 9:00 p.m. on the night of April 9, 2015. He stated that the victim began to get upset, and he "left and went and spent the night with my brother." The defendant said that the victim called him at approximately 6:30 a.m. the next morning, and he told her to leave the house. The defendant stated that he went to the house that same morning on his way to work and found the victim deceased.

After a lengthy sentencing hearing, the trial court imposed a five-year sentence to be served in confinement.

The defendant filed this timely appeal, asserting that the trial court erred by imposing a fully-incarcerative sentence, that the trial court admitted improper rebuttal evidence, and that the trial court based its decision on unreliable or contradicted evidence.

---

[1] Although the defendant objected to the inclusion of this statement in the presentence report at the sentencing hearing, the trial court ruled that this statement was sufficiently reliable for inclusion in the report, and the defendant has not raised the issue on appeal.

## I. Sentencing Hearing

At the sentencing hearing, Meigs County probation supervisor Douglas Brannon testified that he had prepared the defendant's presentence report. In the report, Mr. Brannon included all charges—including those that had been dismissed—and provided commentary related to each charge based on information he gathered from the defendant and the affidavits of complaint related to each charge. The defendant acknowledged to Mr. Brannon that he had previously received drug and alcohol treatment and that he still "drank a lot," stating that he drank a six-pack of beer per day and that his longest period of sobriety had been one week. Mr. Brannon testified that he was concerned with the defendant's suitability for probation due to his alcohol and drug issues, noting that those issues could contribute to his having difficulty maintaining employment.

During cross-examination, Mr. Brannon acknowledged that the Tennessee Department of Correction ("TDOC") policy on the preparation of presentence investigative reports required that the report "must be based upon an independent and objective investigation" and that "[o]fficers shall . . . investigate, interview and collect documentation and verification for each report as detailed in the TDOC community supervision investigation reports and book." He further acknowledged that the policy stated, "Officers shall not include information that pertains to criminal or legal matters that have been terminated in favor of the offender unless otherwise requested by the court." Mr. Brannon conceded that the dismissed charge of October 7, 2014 should not have been included in his report "[a]s applies to that particular policy," but he contended that the dismissed charge was important to show "the relationship between the victim and the defendant" and that he included it because "[t]he court is to be informed as best as it can."

Mr. Brannon explained that he provided commentary to the defendant's prior convictions because the online form provides "a narrative section for commentary," and he "filled it out." He acknowledged that he did not independently investigate the information provided in the affidavit of complaint related to the defendant's DUI conviction, but he presumed that "[t]here was no issue with the affidavit" because the defendant had pleaded guilty to the charge. He described his investigation as including his request to obtain relevant documents from the district attorney's office, speaking with Investigator Alex Clary of the Meigs County Sheriff's Department ("MCSD") and Tennessee Bureau of Investigation ("TBI") Agent Jason Legg, and conducting "some independent research" on the defendant. He acknowledged that he did not investigate the crime scene but emphasized that, because he was preparing the report three years after the victim's death, he "had to rely on the paperwork." He stated that the summary of the incident that he provided as relevant to this case was a "summation of . . . [the] Meigs County report." He took contemporaneous notes during his interview with the defendant, and, throughout the interview, the defendant maintained that he had nothing to do with the crime and that he

-3-

found the deceased victim when he arrived home.

Mr. Brannon stated that he had not been provided the victim's full autopsy report despite his having "requested all documents through the DA's office that were applicable." He acknowledged that he made no reference to the victim's criminal history in the presentence report and that the Habitual Motor Vehicle Offender petition that had been filed against the victim indicated that the victim had three prior DUI convictions.

Mr. Brannon acknowledged that the defendant's Strong-R assessment "indicate[d] that he would be a low risk at probation to re-offend."

Doctor Amy Hawes, an assistant medical examiner at the Knox County Regional Forensic Center, conducted the victim's autopsy. She found that the victim had "about one point one liter of blood in the abdomen," "a laceration of her spleen," "a displaced fracture to the left 11th rib on the back," and "two . . . small abrasions about one quarter inch each on her left lower chest." The victim also had "scattered abrasions and contusions of the forehead and face" and extremities, "contusions beneath the scalp[,] and bleeding in her left temporalis muscle." Doctor Hawes explained that it would take a "very strong punch," a "very strong kick," a "fall," or a "car wreck" to break a rib as the victim's was broken. She stated that the victim's injuries were not likely caused by a "common household fall," noting that "[t]here would be more force required to cause this particular type of injury." Doctor Hawes said that the victim's injuries appeared to have been inflicted "relatively close in time" but that "the aging of injuries is very difficult to put within an exact time window." Noting that some of the bruises may have been as much as 12 to 24-hours old, Doctor Hawes stated that the spleen injury "did appear acute or fresh." Doctor Hawes determined the victim's cause of death to be "multiple blunt force injuries of the torso." Although she was not asked to determine a manner of death for the autopsy report, she testified that she "would classify the manner of death as homicide."

During cross-examination, Doctor Hawes explained that no medical field is able to determine an exact timeline of bruising because "[t]he medical literature shows that there's no firm timeline other than a yellow color in a bruise that would indicate that it might be several days old." She acknowledged that a splenic laceration is "more commonly seen in car wrecks" because "the impact has to be pretty significant." She stated, however, that the victim's injuries could have been caused by "a punch or a kick or anything that would cause blunt trauma or impact to the body," noting that a rib fracture caused from hitting the steering wheel during a car wreck "would cause rib fractures on the front of the chest," whereas the victim had "a rib fracture on the back of the chest." She acknowledged that a car wreck can cause bruising all over a person's body.

Doctor Hawes acknowledged that she did not perform an x-ray of the

victim's body but explained that she did not require one in this case because she "was able to determine the cause of death and the extent of the injuries based on the examination that I did." She found the victim to have alcohol, methamphetamine, and hydroxyzine in her system at the time of her death, but Doctor Hawes did not consider that combination to be lethal in this case, although she acknowledged that the combination of alcohol and methamphetamine "can cause altered behavior." She concluded that the victim's manner of death was homicide based on the victim's having been "in an altercation that led to her injuries," which information she learned from the investigators in this case. Doctor Hawes maintained that it was her medical opinion that the victim "died from blunt force injuries that are consistent with being in an altercation."

Upon questioning by the court, Doctor Hawes explained that in looking at microscopic sections of the victim's spleen, she was able to determine that "all the bleeding appeared acute or fresh," which indicated "that it ha[d] not had a chance to heal or clot." From that information, she concluded that the splenic injury had "happened within a relatively short period of time"—specifically, "minutes or hours"—prior to the victim's death. Considering "the totality of the evidence," including "the rib fracture being on the back of the chest as opposed to the front," Doctor Hawes concluded that the victim did not receive her injuries in a car wreck a day prior to her death.

On further recross-examination, Doctor Hawes stated that she could not narrow down the victim's time of death beyond sometime between 10:00 p.m. and 6:30 a.m. Although the victim had no injuries that would have caused immediate death, Doctor Hawes could not determine how long the victim may have been alive after receiving the injuries.

MCSD Investigator Alex Clary responded to the scene and was assisted in the investigation by TBI Jason Agent Legg. Investigator Clary took the defendant's statement, attended the victim's autopsy, and collected fingernail clippings from the victim for DNA testing. Upon arriving at the scene, he noticed that the defendant "had some scratch marks on his face." Although the defendant told him that he had received the scratches at work, Investigator Clary stated that he thought the scratches "could have been part of fingernails scratching down the face," noting that, although they had started to clot and dry, they "looked to be fresh." He stated that he found feces with what appeared to be shoe prints throughout the house, although most was contained to the bathroom.

During cross-examination, Investigator Clary testified that, at the time he investigated this case, he had not yet been to crime scene investigation school but that a senior officer had been present at the scene with him. Although he started a crime scene log at the scene, he acknowledged that it was unavailable, and he did not know what had happened to it. He stated that he collected the defendant's boots at the scene but

acknowledged that he did not test them for fecal matter. He noted that the victim had fecal matter on the bottom of her feet and that there was no indication that she had been moved after her death. He acknowledged that in order to have taken some of the crime scene photographs, Agent Legg would have had to enter the bathroom where most of the feces and shoe prints were found. He further acknowledged that none of the fecal matter was collected as part of the investigation.

Investigator Clary acknowledged that he did not contact the defendant's employer at Coleman Glass to verify the defendant's account of receiving the scratches on his face from work. He also stated that he did not swab the defendant's face for DNA evidence, did not test the victim's clothing or cellular telephone for DNA evidence, did not collect fingerprints from the scene, and did not process the victim's vehicle as part of his investigation. He conceded that several pieces of evidence lacked a proper chain of custody.

Investigator Clary was present at the victim's autopsy and informed the medical examiner that the victim had been in a verbal altercation with the defendant. He could not recall the exact wording of what he had said, but he stated, "I don't think I would have told her there's no physical altercation." He acknowledged that it was possible that the victim had driven her vehicle while having alcohol and drugs in her system and that the bruising on the victim's knee had been obtained in a car accident. He also acknowledged that the victim had been in a car accident only a couple of days prior to her death and that the victim's daughter had told him that the victim had been bruised in that accident.

TBI Special Agent Kim Lowe testified as an expert in DNA analysis. She tested fingernail clippings collected from the victim and found the presence of male DNA on the clippings from the victim's left hand. The results were inconclusive as to the defendant because of "the limited value of the DNA profile obtained." However, when the TBI obtained Y-STR capability in July 2016, she retested the victim's fingernail clippings and determined that the "Y-STR profile obtained matches [the defendant]; therefore [he] cannot be excluded as the source of this male DNA profile, and barring a mutation, neither can any of his parental male relatives."

During cross-examination, Agent Lowe testified that, like the defendant, the defendant's brother and father also could not be excluded as contributors of the DNA if they are biologically related, unless a mutation had occurred. She did not test for blood on the fingernail clippings and speculated that the DNA contribution was "more than likely probably skin cells." She acknowledged that the defendant was excluded as a contributor of DNA found on other items, including the fingernail clippings of the victim's right hand.

On redirect examination, Agent Lowe clarified that she compared the DNA

on the fingernail clippings to buccal swabs collected from the defendant. She stated that the defendant's being excluded as a contributor of the DNA found on several other items meant that she did not find his DNA on those samples.

The State rested.

Terri Stone, the chief monitoring supervisor agent for All Counties DUI and Ankle Monitoring, testified that she placed an ankle monitor on the defendant on August 19, 2015, in relation to this case and removed it on December 14, 2017. During that monitoring period, she had no issues with the defendant—he made all of his payments and called her before leaving for work each day to report his work location.

Coleman Glass owner Keven Hensley testified that the defendant had worked for him since approximately 2007 and described the defendant as "a good employee." He stated that mishaps were "a common occurrence" in glass installation and estimated that his employees "probably see their own blood about every day." Since making bond in this case, the defendant had never been late to work and displayed a good work ethic. Mr. Hensley stated that, if the defendant was granted probation, he would allow him to continue working at Coleman Glass.

The defendant made an allocution and then rested.

In rebuttal, the State called Rachel Shutt Dockery,[2] the victim's daughter, who testified that the damage to the victim's vehicle, which was visible in several crime scene photographs, had occurred a "[c]ouple of months prior to her death."

On cross-examination, Ms. Dockery acknowledged that the victim had been violent with her on a previous occasion, grabbing her by the hair and hitting her in the face after Ms. Dockery had "talk[ed] to my mom probably not the way that I needed to." She acknowledged that the victim used methamphetamine but denied that it was on a frequent or regular basis. She also denied that the victim had ever given her "any kind of drugs," but she acknowledged that once, when the defendant had "laid a line [of methamphetamine] out for me," the victim had "done it with him." The last time that she had seen the victim was on the Sunday preceding the victim's death.

At the conclusion of Ms. Dockery's testimony, Ms. Dockery read a victim impact statement, and the prosecutor read a victim impact statement from the victim's mother.

---

[2]    The presentence reports identifies Ms. Dockery as Rachel Shutt. We will refer to her here as Ms. Dockery as this is how she identified herself at the sentencing hearing.

The trial court struck from the presentence report the dismissed October 17, 2014 domestic violence charge and its accompanying commentary as well as the commentary related to the September 23, 2005 domestic violence conviction, finding that those statements were unreliable hearsay. The court ruled that the narrative summary related to the instant case was properly included in the report as reliable hearsay because Mr. Brannon knew both of the officers from whom he gathered the information and had testified that they were credible.

The trial court waived a fine and imposed a sentence of five years' incarceration to be served in confinement.

In rendering its decision to impose a fully-incarcerative sentence, the trial court considered the "presentence report, the defendant's physical and mental condition and social history, the facts and circumstances surrounding the offense and the nature of the circumstances of the criminal conduct involved, prior criminal history of the defendant or the lack thereof." The court found that "the defendant had a history of domestic violence" based on the defendant's Roane County conviction in 2005 and had a DUI conviction from 2015. The court also found that the defendant did not "really appreciate the seriousness of the offense and refuse[d] to accept any responsibility."

The trial court found no mitigating factors and found the following three enhancement factors: That the defendant had a "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," that "the personal injuries inflicted upon . . . the victim was particularly great," and that the defendant had "no hesitation about committing a crime when the risk to human life is high." *See* T.C.A. § 40-35-114(1), (6), (10). Additionally, the court found that confinement was "particularly suited to provide an effective deterrent to others likely to commit similar offenses," stating, "[I]t would send[] a terrible message to the community at large that someone can kill their husband or wife or boyfriend or girlfriend even in a heat of rage and be allowed to walk free on probation." *See* T.C.A. § 40-35-103(1)(B).

## II. Denial of Alternative Sentencing

The defendant appeals the imposition of a fully-incarcerative sentence, arguing that the trial court based its decision "upon an incorrect legal standard" by failing to consider the defendant's "favorability for probation." The State contends that the trial court did not err.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing

decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709. The abuse-of-discretion standard of review and the presumption of reasonableness also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The imposition of a five-year sentence in this case mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less . . . ."). Traditionally, the defendant has borne the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited

to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1). When a sentence involving confinement is based solely on the need for deterrence, the record must reflect "that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." *State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000). "When deciding whether a need for deterrence is present and whether incarceration is 'particularly suited' to achieve that goal," trial courts should consider the following non-exclusive factors:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; [and]

(5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

*Hooper*, 29 S.W.3d at 10-12; *see also State v. Fields*, 40 S.W.3d 435, 441-42 (Tenn. 2001).

Here, the trial court relied solely on the need for deterrence under Code section 40-35-103(1)(B) to deny alternative sentencing to the defendant; however, the court

failed to make any finding relative to the need for deterrence or how the defendant's incarceration would achieve that goal. Furthermore, the record is devoid of any evidence of the need for deterrence in the particular jurisdiction or community. The trial court identified only the elements of the offense of voluntary manslaughter in articulating the need for deterrence. Our legislature, however, has seen fit to make voluntary manslaughter a probation-eligible offense. *See* T.C.A. § 39-13-211(b) (identifying voluntary manslaughter as a Class C felony); T.C.A. § 40-35-102(6)(A) (providing that a defendant who is a "standard offender convicted of a Class C . . . felony, should be considered as a favorable candidate for alternative sentencing"). Consequently, a trial court cannot rely on the elements of the offense as the basis for denying alternative sentencing. *See State v. Trent*, 533 S.W.3d 282, 292 (Tenn. 2017) ("If trial courts were permitted to deny probation solely on the basis of the elements of probation-eligible offenses, then the statute providing for probation-eligibility for those offenses would be rendered a nullity.") Because the trial court made no factual findings relative to the need for deterrence, and no such evidence was presented at the sentencing hearing, the trial court erred by ordering the defendant to serve his sentence in confinement on that basis.

Additionally, in denying the defendant probation, the trial court failed to state on the record whether the defendant had carried his burden of establishing his suitability for full probation. Similarly, although the trial court found that the defendant failed to "really appreciate[] the seriousness of the offense and refuse[d] to accept any responsibility," the court did not make any finding regarding the defendant's amenability to rehabilitation. *See* T.C.A. § 40-35-103(5) ("The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed.").

We also note that the trial court misapplied enhancement factor number six, that "[t]he personal injuries inflicted upon . . . the victim was particularly great," and number 10, that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." *See* T.C.A. § 40-35-114(6), (10). Enhancement factor number six is inapplicable when the death of the victim is an element of the offense. *See State v. Kevin E. Trent*, No. E2018-02239-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Knoxville, Apr. 17, 2020) (stating that enhancement factor six is inapplicable when "death of the victim is an element of the offense" (citing *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995))); *State v. David Keith Daugherty*, No. 03C01-9203-CR-00082, 1993 WL 330454, at *4 (Tenn. Crim. App., Knoxville, Aug. 27, 1993) (stating that "[s]ince this factor 'is present in every homicide as an element of the offense,' it cannot be used as an enhancement factor on the voluntary manslaughter offense" (citations omitted)). Similarly, enhancement factor number 10 "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *Trent*, 533 S.W.3d at 294 (citing *State v. Bingham*, 910 S.W.2d

448, 452-53 (Tenn. Crim. App. 1995) *overruled on other grounds by Hooper*, 29 S.W.3d at 9-10). The record before us contains no evidence that the defendant's offense posed a risk to anyone other than the victim. The trial court's misapplication of these enhancement factors, however, is not "a basis in and of itself for vacating a sentence." *Trent*, 533 S.W.3d at 294; *accord Bise*, 380 S.W.3d at 706.

Because the trial court erred by denying alternative sentencing and ordering incarceration contrary to the principles of sentencing, the presumption of reasonableness does not attach to the trial court's decision. *See Trent*, 533 S.W.3d at 295. Because the record before us is "sufficient to allow meaningful appellate review," we will "undertake an independent review of the record" to determine the manner of service of the defendant's sentence. *See id.*

In determining whether a defendant has carried his burden to prove his suitability for full probation, a court should consider the following factors: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *Trent*, 533 S.W.3d at 291 (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

Here, as to the defendant's amenability to rehabilitation and correction, Ms. Stone testified that the defendant complied with all supervision requirements while wearing an ankle monitoring device during a 28-month period from August 2015 to December 2017, including reporting his work locations and paying all monitoring fees. The Strong-R assessment, included in the presentence report, indicates that the defendant poses a low risk of re-offending. Although the defendant's criminal history is relatively short and includes only a misdemeanor conviction for domestic violence in 2005 and a misdemeanor conviction for DUI in 2014, in his interview with Mr. Brannon, he acknowledged using opioids and methamphetamine daily in the past, and Ms. Dockery's statement as relayed in the presentence report indicates methamphetamine usage as recently as 2013 or 2014. Additionally, the presentence report indicates that the defendant committed the present offense in April 2015 while his DUI case was pending. The defendant continued to engage in illegal behavior during the pendency of this case, acknowledging to Mr. Brannon that he smoked marijuana only a few days prior to his September 2018 interview for the presentence investigation. On balance, we find that the defendant has failed to establish his amenability to correction, and this factor weighs against a grant of probation.

The defendant's employment history weighs in favor of a grant of probation. Mr. Hensley testified that the defendant had worked at Coleman Glass Company since 2007 and that he was "a good employee." Since making bond in this case, the defendant maintained a good work ethic and always arrived to work on time. Mr. Hensley also stated

that the defendant could continue his employment at Coleman Glass if granted probation.

The evidence in the record indicates that the defendant has a history of alcohol and substance abuse issues. Mr. Brannon testified that the defendant had reported drinking a six-pack of beer per day with his longest period of sobriety being one week, and the presentence report indicates that the defendant acknowledged that he had an "alcohol abuse issue" and that he was advised to undergo a drug and alcohol treatment program in June of 2018, but he discontinued that treatment due to his inability to afford it. As stated above, the defendant acknowledged smoking marijuana five to six days prior to his presentence interview with Mr. Brannon, and the defendant acknowledged having abused opioids and methamphetamine until approximately 10 to 12 years prior to the interview. The presentence report also indicates, however, that Ms. Dockery described to Agent Legg an incident in which the defendant was using methamphetamine as recently as 2013 or 2014. Additionally, Ms. Dockery testified that, on one occasion, the defendant had "laid a line [of methamphetamine] out" for her. Although the trial court did not make any finding of fact regarding the defendant's drug and alcohol abuse, the trial court deemed the inclusion of Agent Legg's summary of the investigation in the presentence report to be reliable.

Moreover, the defendant failed to complete treatment for his substance abuse issues. Although he was sent to Peninsula clinic in Knoxville for treatment for alcohol abuse and was advised to continue treatment, he discontinued the treatment after two days because he could not afford it despite his spending over $300 per month on alcohol. Consequently, the defendant's history of drug and alcohol abuse and his unwillingness to complete treatment weighs against a grant of probation.

The trial court found, and we agree, that the defendant failed to accept responsibility for this offense. Although the defendant expressed sorrow for the loss to the victim's family, he maintained his ignorance of the circumstances of the victim's injuries and death, which assertion the trial court deemed incredible. The defendant's no-contest plea does not preclude a finding that he failed to "accept responsibility for his criminal conduct as it relates to his rehabilitation potential." *See State v. Jeremy Lance Przybysz*, No. M2007-02169-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Apr. 27, 2009) (quoting *State v. Homer L. Evans*, No. E2000-00069-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Mar. 20, 2001)). A defendant's failure to accept responsibility weighs against a grant of probation and is sufficient in and of itself to support the denial of probation. *See State v. Cody Garris*, No. M2012-01263-CCA-R3-CD, slip op. at 9-10 (Tenn. Crim. App., Nashville, Mar. 6, 2013) (stating that a "defendant's lack of candor and failure to accept responsibility . . . are both acceptable grounds for the denial of both judicial diversion and probation") (citing *State v. Souder,* 105 S.W.3d 602, 608 (Tenn. Crim. App. 2002); *State v. Dowdy*, 894 S.W.2d 301, 307 (Tenn. Crim. App. 1994)).

The defendant's social history is somewhat inconsistent. According to the presentence report, the defendant was close with his brother and considered him to be his primary family member. The Strong-R assessment indicates that the defendant's family was "generally positive or pro-social" with "minimal family conflict" and that some family members were "generally willing to intervene and support" the defendant. In contrast, the trial court found that the defendant and the victim had "a history . . . of domestic violence, domestic assaults where teeth were knocked out, [and] punches in the ribs," which finding is supported by the Agent Legg's summary of his investigation and the victim impact statements as included in the presentence report. Despite the defendant's having a supportive family, this factor weighs against the grant of probation in light of the defendant's history of domestic violence.

The defendant was 61 years old at the time of his sentencing hearing, and the presentence report indicated that the defendant reported no physical health issues and a "fair" mental health status. He acknowledged a prior suicide attempt in 1985 after the death of his wife, after which he spent three days in a mental health facility. At some point, he completed four to five months of outpatient treatment at Hiawassee Mental Health Center, but he ceased participation in that program because he "didn't see the need." Nothing in the defendant's mental health indicates that he could not be successful on supervised probation, and this factor weighs in favor of a grant of probation.

The circumstances of the offense cannot be determined in this case. The trial court found the victim died from injuries inflicted during an altercation with the defendant, and we agree with that assessment; however, without knowing the impetus for the altercation, the manner in which the defendant injured the victim, or the period of time over which the injuries were inflicted, we cannot determine the circumstances of the offense, and this factor has no bearing on our decision of whether to grant the defendant probation.

As stated above, the record contains no proof of what deterrence value the defendant's confinement would provide.

On balance, we find that the defendant has failed to demonstrate that he should be granted alternative sentencing in this case. The defendant's unwillingness to accept responsibility, his substance abuse issues, his history of domestic violence, and his lack of amenability to supervision in the community indicate that he is not a good candidate for supervised probation, and, based on the record before us, we decline to grant an alternative sentence.

*III. Rebuttal Evidence*

-14-

Next, the defendant contends that the trial court erred by permitting the State to present certain evidence in rebuttal. Specifically, the defendant argues that the State should not have been permitted to present victim impact statements as part of its rebuttal evidence. The State argues that the defendant has waived appellate review of this issue for failure to object to the reading of the statements contemporaneously. In the alternative, the State contends that the trial court did not err in admitting the statements.

The failure to lodge a contemporaneous challenge results in a waiver of the issue. *See* Tenn. R. Evid. 103; Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Here, the record reflects that the defendant did not object to the reading of the victim impact statements after the defendant's case in chief. The defendant's only objection to the victim impact statements was regarding any reference to a recommended sentence, which objection the trial court sustained. Because the defendant failed to object to the timing of the reading of the victim impact statements, he has waived this issue.

Waiver notwithstanding, the record is clear that the statements in question were not presented as rebuttal evidence. Although Ms. Dockery read her victim impact statement immediately after she finished testifying, the record makes it clear that her testimony had ended before she read the statement. At the close of the defendant's cross-examination of Ms. Dockery, the State indicated that it would not conduct a redirect examination, stating, "I have nothing further, Your Honor. Although, [Ms. Dockery] does desire to read a victim impact statement that she's got prepared." The victim impact statement from the victim's mother could not reasonably have been construed as rebuttal evidence as the statement was read into the record by the prosecutor. Furthermore, both victim impact statements were made a part of the presentence report, which had already been exhibited to the hearing. Accordingly, this issue lacks merit.

*IV. Trial Court's Assessment of Evidence*

Finally, the defendant argues that the trial court's decision to impose a sentence of confinement was "not supported by the relevant and reliable evidence" and that the court's findings "were either contradicted by the evidence in the record or were otherwise unreliable and should not have influenced the court's sentencing decision." The State argues that the trial court properly considered the evidence.

The defendant points to the following four issues that factored into the trial court's sentencing decision, but which, the defendant alleges, were "either contradicted by the evidence in the record or were otherwise unreliable": 1) the court's finding that the defendant had a history of domestic violence, 2) the court's reliance on the medical examiner's testimony in determining that the victim sustained her injuries in an altercation rather than in a car accident, 3) the court's finding that the defendant did not appreciate the seriousness of the offense, and 4) the court's consideration of the victim impact statements.

The defendant asserts that the court failed to state facts supporting its finding of enhancement factors as they related to the victim's injuries and the risk to human life and that the court erred by finding that the defendant had a history of domestic violence. As stated above, the trial court erred by applying enhancement factors six and 10. Accordingly, only the trial court's finding that the defendant had a history of domestic violence is at issue here. The presentence report's indication that the defendant had a prior conviction for domestic violence is sufficient to support the trial court's finding.

Next, the defendant asserts that the court should not have relied on Doctor Hawes' testimony to find that the victim sustained her injuries in an altercation because Doctor Hawes had also stated that such injuries were more commonly associated with vehicle accidents. Doctor Hawes, however, testified that the victim's manner of death was homicide and that her injuries were inconsistent with a vehicle accident in this case, in part because the victim's broken rib was in the back of her chest rather than in the front. This evidence supports the trial court's findings as to the victim's injuries.

The defendant next argues that the trial court erred by finding that the defendant did not appreciate the seriousness of the offense. The defendant maintained throughout the sentencing hearing his theory that the victim sustained her injuries in a car accident and that he had nothing to do with her death. As stated above, the trial court found the defendant's ignorance of the circumstances surrounding the victim's injuries incredible. The trial court also found that the defendant and the victim had "a history . . . of domestic violence, domestic assaults where teeth were knocked out, [and] punches in the ribs," all of which the trial court determined "seemed to be consistent with the injuries that [the victim] suffered on the date that she died." Consequently, the trial court did not err by finding that the defendant failed to take responsibility or appreciate the seriousness of the offense.

Finally, the defendant contends that the court gave undue weight to the victim impact statements while failing to consider evidence in his favor such as his full compliance with his bond conditions, his lack of prior felony convictions, and his being identified as "low risk" on the Strong-R assessment. The trial court, however, explicitly

stated that, in rendering its decision, it considered the presentence report, the defendant's social history, and his prior criminal convictions, and, consequently, this issue lacks merit.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE